981 A.2d 99 (2009)
410 N.J. Super. 209
In re AGRICULTURAL, AQUACULTURAL, AND HORTICULTURAL WATER USAGE CERTIFICATION RULES, N.J.A.C. 7:20A-1.1 et seq.
DOCKET NO. A-3283-06T3.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 2009.
Decided October 21, 2009.
*103 Lewis Goldshore argued the cause for the New Jersey Farm Bureau (Goldshore, Cash & Kalac, P.C., attorneys; Mr. Goldshore, of counsel; Robert J. Cash, Lawrenceville, on the briefs).
Amy C. Donlon, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Anne Milgram, Attorney General, attorney; Lewis Scheindlin, Assistant Attorney General, of counsel; Ms. Donlon, on the brief).
Before Judges RODRÍGUEZ, PAYNE and WAUGH.
The opinion of the court was delivered by
WAUGH, J.A.D.
The New Jersey Farm Bureau (Bureau), which describes itself as the largest organization of farmers and farm-related interests in New Jersey, challenges the administrative action of respondent New Jersey Department of Environmental Protection (DEP) in readopting and amending N.J.A.C. 7:20A, regulations that implement and enforce the Water Supply Management Act (Water Act), N.J.S.A. 58:1A-1 to -17. For the reasons set forth below, we uphold the validity of most of the challenged regulations, but find three regulatory amendments, N.J.A.C. 7:20A-1.3, N.J.A.C. 7:20A-2.3(j), and N.J.A.C. 7:20A-2.5(a)(11)(v), invalid because they are ultra vires; and we require the rewriting of N.J.A.C. 7:20A-1.7(c)(1), because it is ultra vires as written.

*104 I.
The Legislature passed the Water Act in 1981 after making the following findings:
[(1)] that the water resources of the State are public assets of the State held in trust for its citizens and are essential to the health, safety, economic welfare, recreational and aesthetic enjoyment, and general welfare; . . . .
[(2)] that because some areas within the State do not have enough water to meet their current needs and provide an adequate margin of safety, the water resources of the State and any water brought into the State must be planned for and managed as a common resource from which the requirements of the several regions and localities in the State shall be met; . . . [and
(3)] that it is necessary to insure that within each basin there exist adequate water supplies to accommodate present and future needs[.]
[N.J.S.A. 58:1A-2.]
The Water Act gives DEP broad responsibility to manage the State's water resources "to ensure an adequate supply and quality of water for citizens of the State, both present and future, and to protect the natural environment of the waterways of the State." N.J.S.A. 58:1A-2. It directs DEP to adopt "a monitoring, inspection and enforcement program, a program to study and manage the State's water resources and plan for emergencies and future water needs, and regulations to manage the waters of the State during water supply and water quality emergencies." N.J.S.A. 58:1A-2.
Specifically, the Water Act gives DEP the powers to adopt and enforce
rules and regulations to control, conserve, and manage the water supply of the State and the diversions of that water supply to assure the citizens of the State an adequate supply of water under a variety of conditions and to carry out the intent of this act. These rules and regulations may apply throughout the State or in any region thereof and shall provide for the allocation or the reallocation of the waters of the State in such a manner as to provide an adequate quantity and quality of water for the needs of the citizens of the State in the present and in the future and may include, but shall not be limited to:
a. A permit system to allocate or reallocate any or all of the waters of the State, which system shall provide for the issuance of permits to diverters of more than 100,000 gallons per day of the waters of the State, containing at a minimum the conditions required by this act;
b. Standards and procedures to be followed by diverters to ensure that:
(1) Proper methods are used to divert water;
(2) Only the permitted quantity of water is diverted and that the water is only used for its permitted purpose;
(3) The water quality of the water source is maintained and the water standards for the use of the water are met;
(4) [DEP] is provided with adequate and accurate reports regarding the diversion and use of water;
c. Inspection, monitoring, reporting and enforcement procedures necessary to implement and enforce the provisions of this act;
d. Standards and procedures to be followed to determine the location, extent and quality of the water resources of the State and plan for their future use to meet the needs of the citizens of the State;
e. Standards and procedures to be followed to maintain the minimum water *105 levels and flow necessary to provide adequate water quantity and quality;
f. Standards and procedures governing the maintenance of adequate capacity by, and withdrawal limits for, water purveyors.
[N.J.S.A. 58:1A-5.]
The Water Act expressly instructs DEP to establish two separate programs for the authorization of ground and surface water diversions of over 100,000 gallons per day. The first program consists of "a uniform water diversion permit system and fee schedule," as set forth in N.J.S.A. 58:1A-2 and -7(a), and has general application. The second program, which is "in lieu of" the general permit system, applies only to persons diverting 100,000 or more gallons of water per day for agricultural, aquacultural or horticultural purposes.[1]N.J.S.A. 58:1A-6(a)(2).
Under the agricultural program, which is the subject of this appeal, "any person diverting 100,000 or more gallons of water per day for agricultural or horticultural purposes" must obtain approval of "a five-year water usage certification program." Ibid. As originally enacted on August 13, 1981,[2]N.J.S.A. 58:1A-6(a)(2) provided that the certificates would be approved by DEP, "in consultation with the appropriate county agricultural agent."[3] There is a county agricultural agent on staff at the county cooperative extension office in each county. The extension offices are a partnership among the Rutgers Cooperative Extension, the county boards of chosen freeholders, and the United States Department of Agriculture.
However, less than a month after the original statute's effective date of August 13, 1981, N.J.S.A. 58:1A-6(a)(2) was amended by L. 1981, c. 277, to provide that the certification would be obtained with the approval of the "county agricultural agent," rather than DEP, and that such approval would "be based on standards and procedures established" by DEP. The statement to Senate Bill 3346, which was quite brief, stated that the amendment was "intended to address the concerns which residents of the southern portion of this State have expressed over the proposed water supply legislation," which was still pending as a separate bill when the statement was written.
A water usage certification gives the holder
the right to construct, repair or reconstruct dams or other structures, the right to divert water for irrigation, frost protection, harvesting and other agriculturally-related purposes, including aquaculture, and the right to measure the amount of water diverted by means of a log or other appropriate record. . . .
[N.J.S.A. 58:1A-6(a)(2).]
Both permits and certifications are renewable "upon the expiration thereof, with any conditions deemed appropriate by [DEP], for the same quantity of water, except that DEP may, after notice and public hearing, limit that quantity to the *106 amount currently diverted, subject to contract, or reasonably required for a demonstrated future need." N.J.S.A. 58:1A-7(b).[4] DEP also has the authority to reduce the quantity allowed under existing certifications, after notice and a public hearing, in designated areas of critical water supply concern. Ibid.
DEP adopted its initial regulations in 1983. They were codified as N.J.A.C. 7:20A, and have been readopted, with amendments, from time to time since then. The most recent readoption is at issue in this case.
DEP proposed readopting the regulations with significant amendments on July 17, 2006. 38 N.J.R. 2947(a) (July 17, 2006). The Bureau submitted timely comments and objections during the public comment period. On January 2, 2007, DEP readopted the regulations with amendments, effective immediately. 39 N.J.R. 39(a) (Jan. 2, 2007).
In the 2007 readoption, DEP proposed broad changes to the regulations, having concluded that water diversions for agricultural uses require "a higher level of scrutiny." 38 N.J.R. at 2947. DEP explained its reasons as follows:
Diversions of water to serve agricultural [] activities, just as with other diversions regulated under the Water Supply Allocation Permits rules, N.J.A.C. 7:19, may have significant adverse impacts on natural resources and other users of the resource. These impacts can result in diminished stream flows, lowered water levels in wetlands, accelerated saltwater intrusion in ground waters, reduced yields from diversion sources used by other agricultural and non-agricultural interests and the spreading of contamination. Historically, many of these impacts were not fully addressed in the agricultural [] water usage certification review process. Due to increased stress on the State's water resources from a growing population and associated development, and the need to conserve and protect valuable natural resources, [DEP] has determined that water diversions for agricultural [] uses require a higher level of scrutiny than is currently provided under the existing rules. To address the need to reduce the impacts associated with this water use, [DEP] is proposing both technical and substantive amendments to the rules that include new definitions, requirements for more precise source location information, additional assessment of natural resource impacts, more stringent certification conditions to protect natural resources and other users, requiring that cranberry growing operations provide the method used to determine water usage, and a requirement to submit an agricultural development plan to justify maintaining allocation amounts at the level approved in the certification when water use reports indicate less than that amount is being used.
[Ibid.]
According to DEP, there are approximately 1,100 agricultural water usage certifications and registrations[5] in effect in New Jersey. 38 N.J.R. at 2957. DEP concluded that, "[w]ithout effective planning and management of the quantity and use of the State's water resources, including *107 water supply emergencies, the State's future development, public health and well-being, and its ability to sustain agriculture [] enterprises, could be jeopardized." Ibid.
On appeal, the specific regulations challenged by the Bureau fall into four general categories: (1) DEP's modification of the presumption of public interest for any agricultural use, N.J.A.C. 7:20A-1.2(c); (2) implementation of a remedial requirement arising from diversion-source-interference complaints, N.J.A.C. 7:20A-1.7; (3) changes to the application process, N.J.A.C. 7:20A-2.3, -2.4, and -2.5; and (4) changes in conditions attached to water usage certifications, N.J.A.C. 7:20A-2.6.

II.
Before turning to the Bureau's challenges to specific regulations, we outline the well-established general principles applicable in an appellate court's review of administrative regulations. We also discuss the purposes of the Water Act and its relationship to other statutes involving agriculture relied on by the Bureau in its appellate arguments.

A.
Reviewing courts generally accord substantial deference to the interpretation an agency gives a statute that it is charged with enforcing. N.J. Tpk. Auth. v. Am. Fed'n of State, County & Mun. Employees, Council 73, 150 N.J. 331, 351, 696 A.2d 585 (1997). Accord N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385, 955 A.2d 886 (2008). In addition, "[i]n reviewing agency action, the fundamental consideration is that a court may not substitute its judgment for the expertise of an agency `so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable.'" Williams v. Dep't of Human Servs., 116 N.J. 102, 107, 561 A.2d 244 (1989) (quoting Dougherty v. Dep't of Human Servs., 91 N.J. 1, 12, 449 A.2d 1235 (1982)). Accord In re Distrib. of Liquid Assets Upon Dissolution of the Union County Reg'l High Sch. Dist. No. 1, 168 N.J. 1, 10, 773 A.2d 6 (2001). This applies to policymaking, fact-finding and statutory interpretation. Id. at 10-11, 773 A.2d 6.
"Thus a regulation can only be set aside if it is proved to be arbitrary or capricious, plainly transgresses the statute it purports to effectuate, or alters the terms of the statute and frustrates the policy embodied in it." In re Adopted Amendments to N.J.A.C. 7:7A-2.4, 365 N.J.Super. 255, 265, 839 A.2d 60 (App.Div. 2003). It is well settled that agency regulations are presumed valid and are accorded a presumption of reasonableness. In re N.J. Am. Water Co., 169 N.J. 181, 188, 777 A.2d 46 (2001); In re Adoption of N.J.A.C. 11:3-29, 410 N.J.Super. 6, 41, 979 A.2d 770, 791 (App.Div.2009).
Nevertheless, administrative agencies derive their authority from legislation, the terms of which they cannot alter, nor are they permitted to frustrate the legislative purpose. N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n, 82 N.J. 57, 82, 411 A.2d 168 (1980); Rider Ins. Co. v. First Trenton Cos., 354 N.J.Super. 491, 499, 808 A.2d 143 (App.Div.2002); In re Adoption of N.J.A.C. 11:3-29, supra, 410 N.J.Super. at 41, 979 A.2d 770, 791. The party contesting the regulation has the burden of proving its invalidity. N.J. State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999).
While findings of ultra vires actions are disfavored, New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561, 384 A.2d 795 (1978), "[o]ur role is to *108 enforce the will of the Legislature" because "[s]tatutes cannot be amended by administrative fiat." TAC Assocs. v. N.J. Dep't of Envtl. Prot., 408 N.J.Super. 117, 124, 973 A.2d 969 (App.Div.2009). Consequently, a "regulation that is plainly at odds with its enabling statutory authority must be set aside." Id. at 122, 973 A.2d 969 (citing In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89, 852 A.2d 1083 (2004)).
In reviewing the validity of the regulations against an assertion that they are ultra vires, we must ascertain the Legislature's intent with respect to its enactment of the statute at issue. We do so in accordance with well-established guidelines.
At the outset, we restate the core principles of statutory construction that must guide our analysis. "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). A court should "ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid.; see also Soto v. Scaringelli, 189 N.J. 558, 569, 917 A.2d 734 (2007). . . . Ultimately, a court's role when analyzing a statute is to give effect to the Legislature's intent as evidenced by the "language of [the] statute, the policy behind it, concepts of reasonableness and legislative history." Johnson Mach. Co. v. Manville Sales Corp., 248 N.J.Super. 285, 303-04, 590 A.2d 1206 (App.Div.1991) (citing Monmouth County v. Wissell, 68 N.J. 35, 342 A.2d 199 (1975)).
[D'Ambrosio v. Dep't of Health & Senior Servs., 403 N.J.Super. 321, 334, 958 A.2d 110 (App.Div.2008).]
In reviewing regulations, we must also be mindful that "[a]dministrative agencies possess the ability to be flexible and responsive to changing conditions." Texter v. Dep't of Human Servs., 88 N.J. 376, 385, 443 A.2d 178 (1982). "This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy." Ibid.
However, regulatory requirements must also be sufficiently specific to apprise those who are regulated of what the agency is requiring. In New Jersey Ass'n of Health Care Facilities v. Finley, 83 N.J. 67, 82-83, 415 A.2d 1147, appeal dismissed and cert. denied, 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980), our Supreme Court declared:
It is fundamental that administrative regulations must . . . be sufficiently definite to inform those subject to them as to what is required. At the same time, regulations must be flexible enough to accommodate the day-to-day changes in the area regulated. See Trap Rock Industries, Inc. v. Kohl, 59 N.J. 471, 483, 284 A.2d 161 (1971)[, cert. denied, 405 U.S. 1065, 92 S.Ct. 1500, 31 L. Ed.2d 796 (1972)].
See N.J. Soc'y for Prevention of Cruelty to Animals, supra, 196 N.J. at 411, 955 A.2d 886 ("We do not fault the Department for its decision not to attempt to create an exhaustive list of what is permitted and the precise circumstances that pertain.").

B.
The Bureau contends that the regulations at issue are inconsistent with legislative policy embodied in the Right to Farm Act (Farm Act), N.J.S.A. 4:1C-1 to -10.4, and the Agriculture Retention and Development Act (ARDA), N.J.S.A. 4:1C-11 to -43.1, both of which were enacted in January *109 1983, just a few years after the Water Act.
The Bureau contends that DEP ignored those agriculture-friendly mandates by prioritizing general water usage, and its own regulatory power, instead of encouraging the maintenance of agricultural production and business. To support its assertion that DEP has disregarded the State's policy favoring agriculture, the Bureau points to the following responses by DEP during the promulgation process:
[DEP] is required under the [Water Act] to protect the water resources for use by the citizens of New Jersey, and cannot issue a water usage certification for agriculture if it results in adverse impacts to other users or the environment. [DEP] acknowledges the importance of water to the agriculture industry and the need to balance demands against other competing priorities, including potable supply, enhancement of natural ecosystems, and commercial and industrial uses. However, the amount of water available for a particular use and location is dependent on the sustainability of the water resource to meet the withdrawal while still providing protection for other users and the environment. [DEP] makes its decisions on authorizing water withdrawals based on these considerations. Prioritizing water for a particular use is not the purpose of these rules.
In addition, the concept of guaranteeing water for preserved farms is not universally accepted by the agriculture community. Some take the position that if water is reserved solely for use by preserved farms, the viability of other farming operations will suffer and may result in the loss of farms to other forms of development. [DEP] will continue to work diligently within its authority to ensure water is allocated equitably to various user groups in meeting State initiatives, and within the resource constraints in a particular region.
[DEP] believes the adopted amendments do not result in an unreasonable burden on the agriculture industry. The natural resource protections provided by the adopted amendments will ensure that allocations remain sustainable and protective of other users, including those diverting water for agriculture purposes. The amendments are intended to balance the need to protect the State's natural resources and water users as mandated by the [Water Act] with the agriculture industry's need for a streamlined regulatory process. The costs and time requirements for the water usage certification applicant and holder to comply with these rules are reasonable when considered against the potential to cause significant adverse impacts to the State's resources and economy, including the agriculture economy.
[39 N.J.R. at 48.]
The Bureau makes the broad claim that the regulations at issue are invalid because they are overly burdensome to farmers. They also contend that the Farm Act and the ARDA require DEP to grant priority to agricultural water usage without balancing agricultural uses with any other competing water-usage interests. Although we disagree with such a broad assertion, we nevertheless conclude from the language of those statutes and the Water Act itself that there is a legislative mandate to preclude unnecessarily onerous regulation of agricultural activities.
The Legislature set forth the purposes for enactment of the Farm Act in its legislative findings, N.J.S.A. 4:1C-2, as follows:
a. The retention of agricultural activities would serve the best interest of all citizens of this State by insuring the numerous social, economic and environmental *110 benefits which accrue from one of the largest industries in the Garden State;
b. Several factors have combined to create a situation wherein the regulations of various State agencies and the ordinances of individual municipalities may unnecessarily constrain essential farm practices;
c. It is necessary to establish a systematic and continuing effort to examine the effect of governmental regulation on the agricultural industry;
d. All State departments and agencies thereof should encourage the maintenance of agricultural production and a positive agricultural business climate;
e. It is the express intention of this act to establish as the policy of this State the protection of commercial farm operations from nuisance action, where recognized methods and techniques of agricultural production are applied, while, at the same time, acknowledging the need to provide a proper balance among the varied and sometimes conflicting interests of all lawful activities in New Jersey.
The Farm Act protects commercial farmers by preempting municipal and county land use authority over commercial farms, N.J.S.A. 4:1C-9, and by shielding them from nuisance suits brought by neighbors. N.J.S.A. 4:1C-10; Twp. of Franklin v. Hollander, 172 N.J. 147, 149-50, 796 A.2d 874 (2002); Borough of Closter v. Abram Demaree Homestead, Inc., 365 N.J.Super. 338, 347-48, 839 A.2d 110 (App. Div.), certif. denied, 179 N.J. 372, 845 A.2d 1254 (2004). It does not, however, contain any specific exemption with respect to the Water Act.
The Farm Act also created the State Agriculture Development Committee (Committee) to ensure that the "the State's regulatory action with respect to agricultural activities may be undertaken with a more complete understanding of the needs and difficulties of agriculture." N.J.S.A. 4:1C-4(a). The Committee has specific authority to "[r]eview and evaluate the proposed rules, regulations and guidelines of any State agency in terms of feasibility, effect and conformance with the intentions and provisions of [the Farm Act]." N.J.S.A. 4:1C-6(b). That includes the authority to negotiate with other agencies with respect to any "conflict between the regulatory practices of any State instrumentality and the agricultural management practices recommended by the [C]ommittee." N.J.S.A. 4:1C-6(d). It is not clear from the record whether the Committee had any involvement in the review or adoption of the regulations at issue here. However, we do not understand N.J.S.A. 4:1C-6(d) to require such negotiation as a condition precedent to judicial review.
Similarly, the Legislature set forth the purposes for enactment of the ARDA in its legislative findings, N.J.S.A. 4:1C-12, as follows:
a. The strengthening of the agricultural industry and the preservation of farmland are important to the present and future economy of the State and the welfare of the citizens of the State, and that the Legislature and the people have demonstrated recognition of this fact through their approval of the "Farmland Preservation Bond Act of 1981," . . .;
b. All State departments and agencies thereof should encourage the maintenance of agricultural production and a positive agricultural business climate[.]
The ARDA coordinates the development of county farmland preservation programs in areas where agriculture is presumed the first priority land use. N.J.S.A. 4:1C-12(c); Twp. of S. Brunswick v. State Agric. Dev. Comm., 352 N.J.Super. 361, 364-65, 800 A.2d 202 (App.Div.2002).
*111 The ARDA allows each county to create its own county agriculture development board, N.J.S.A. 4:1C-14, which then can develop and adopt "agricultural retention and development programs, which shall have as their principal purpose the long-term encouragement of the agricultural business climate and the preservation of agricultural land in the county," N.J.S.A. 4:1C-15(a), and which can assist farmers with permit applications for state agencies, N.J.S.A. 4:1C-16(b). We note that a number of county boards commented on the regulatory proposals at issue.
Moreover, commercial farm owners and operators under the Farm Act, and all agricultural operations, activities and structures under the ARDA, must still conform to "all relevant federal or State statutes or rules and regulations adopted pursuant thereto." N.J.S.A. 4:1C-9 and 4:1C-26(a).
The Water Act itself evidences a legislative intention to minimize the administrative burden on those seeking to use water for agricultural purposes by requiring DEP to adopt a separate "certification" program exclusively for agricultural users in lieu of the generally applicable "permit" program. N.J.S.A. 58:1A-6(a)(2). Although the Water Act requires DEP to establish the "standards and procedures" for the program, approval for issuance of the certification is to be made by the "appropriate county agricultural agent." Ibid.
The Legislature is presumed to be familiar with its own enactments. In re Authorization to Conduct a Referendum on the Withdrawal of the Borough of Oradell from the River Dell Reg'l Sch. Dist., 406 N.J.Super. 198, 209, 967 A.2d 341 (App.Div.2009). Having just given DEP broad, general authority in the Water Act to regulate the usage of water in New Jersey "to ensure an adequate supply and quality of water for citizens of the State, both present and future, and to protect the natural environment of the waterways of the State," N.J.S.A. 58:1A-2, we find it "incongruous" that it would then substantially limit the scope of DEP's broad authority and accord agricultural usage a favored position in terms of water usage, as opposed to regulatory burden, without specifically saying so in the Farm Act or the ARDA. See Am. Fire & Cas. Co. v. N.J. Div. of Taxation, 189 N.J. 65, 82-83, 912 A.2d 126 (2006).
We read the Water Act together with the Farm Act and the ARDA in an effort to harmonize them and ascertain an overall legislative intent. In re Return of Weapons to J.W.D., 149 N.J. 108, 115-16, 693 A.2d 92 (1997); Burt v. W. Jersey Health Sys., 339 N.J.Super. 296, 304, 771 A.2d 683 (App.Div.2001) ("In construing statutes relating to the same subject matter, we must strive to harmonize them"). We discern an overall intention to minimize regulatory burdens on agricultural endeavors where possible, but to exempt agricultural endeavors from specific regulations only where specifically stated in the statutory enactment. For example, both the Farm Act and the ARDA contain general language about easing regulatory burdens on farming. N.J.S.A. 4:1C-2(b); N.J.S.A. 4:1C-12(c). But where specific exemptions from regulation are intended, for example in the Farm Act, the exemptions are quite specifically set forth. N.J.S.A. 4:1C-9 (land use); 4:1C-10 (nuisance suits). See also N.J.S.A. 4:1C-2(e) ("It is the express intention of this act to establish as the policy of this State the protection of commercial farm operations from nuisance action, where recognized methods and techniques of agricultural production are applied, while, at the same time, acknowledging the need to provide a proper balance among the varied and sometimes conflicting interests of all lawful *112 activities in New Jersey." (Emphasis added)).
We find nothing in L. 1981, c. 277 (providing for the county agricultural agent to be the approving authority), the Farm Act, or the ARDA to suggest that the Legislature intended to depart from its broad and general concern for "the water resources of the State" that "are public assets of the State held in trust for its citizens and are essential to the health, safety, economic welfare, recreational and aesthetic enjoyment, and general welfare," as expressed in N.J.S.A. 58:1A-2, or its broad conferral of authority on DEP to adopt and enforce "rules and regulations to control, conserve, and manage the water supply of the State and the diversions of that water supply to assure the citizens of the State an adequate supply of water under a variety of conditions" and generally "to carry out the intent" of the Water Act. N.J.S.A. 58:1A-5. While the regulatory burden on agricultural endeavors is not to become excessive, the Legislature has not articulated a priority for agricultural use of the State's available water resources over all other uses.

III.
We now turn to a discussion of specific regulatory provisions.

A.
Initially, we note that DEP amended N.J.A.C. 7:20A-1.3 to change the role of the county agent, despite the clear language of N.J.S.A. 58:1A-6(a)(2), from "decision maker" to someone who is to be consulted by the "person designated by [DEP] to make decisions on applications." A similar change was made in N.J.A.C. 7:20A-2.3(j), which provides that DEP shall approve, deny or return applications, "in consultation with the county agricultural agent." In essence, DEP's amendments repeal by regulation the statutory change made by Section 3 of L. 1981, c. 277. Although the revisions to N.J.A.C. 7:20A-1.3 and N.J.A.C. 7:20A-2.3(j) were not specifically raised by the Bureau in its appellate brief, they are patently ultra vires and invalid. An administrative agency cannot amend the statute by "administrative fiat." TAC Assocs., supra, 408 N.J.Super. at 124, 973 A.2d 969. We do not view DEP's language change as non-substantive, as DEP suggests at 39 N.J.R. 41. While DEP may assist the agents in issuing the certifications themselves, any change in the identity of the actual decision maker would have to be made by the Legislature. In re Adopted Amendments to N.J.A.C. 7:7A-2.4, supra, 365 N.J.Super. at 265, 839 A.2d 60.

B.
In readopting N.J.A.C. 7:20A-1.2(c), DEP made a significant change by modifying what had previously been an unconditional presumption that agricultural use of water is in the public interest. As amended, the presumption is now conditional. The provision as amended provides as follows:
Any agricultural [] uses of water in the State of New Jersey will be presumed to be in the public interest . . ., provided the agricultural [] activity employs agricultural management practices for conserving water to the maximum extent possible, minimizes the amount of water utilized, and uses the lowest quality of water for the intended purpose considering the size of the farm management unit where water will be used, crop type, and the amount of impervious surface on the farm management unit.[[6]]

*113 [N.J.A.C. 7:20A-1.2(c) (emphasis added).]
In its adoption statement, DEP took the position that, because it is responsible for protection of the State's water resources for use by all citizens, it "cannot issue a water usage certification if it results in adverse impacts to other users or the environment." 39 N.J.R. at 48. While acknowledging the importance of water to the agricultural industry, DEP asserted its need to balance those demands against competing priorities, including "potable supply" and "commercial and industrial uses." Ibid. However, in response to concerns expressed during the comment period, DEP responded that it would "take economic feasibility of a particular water conservation method into consideration when making the decision on an application." 39 N.J.R. at 50.
Initially, we note that the presumption at issue was created by DEP itself in its original regulations and was not legislatively mandated in the Water Act. While it is true that the presumption has existed for over twenty-five years, the Water Act specifically permits DEP to amend the regulations and directs that the regulations "provide for the allocation or the reallocation of the waters of the State in such a manner as to provide an adequate quantity and quality of water for the needs of the citizens of the State in the present and in the future." N.J.S.A. 58:1A-5 (emphasis added). As noted above, administrative agencies must "possess the ability to be flexible and responsive to changing conditions." Texter, supra, 88 N.J. at 385, 443 A.2d 178.
It is also significant that the presumption is retained, albeit conditioned on the use of "management practices" that "conserv[e] water to the maximum extent possible, minimize[] the amount of water utilized, and use[] the lowest quality of water for the intended purpose." N.J.A.C. 7:20A-1.2(c). Those requirements are consistent with the legislative direction that DEP establish standards for "diverters" of water set forth in N.J.S.A. 58:1A-5(b)-(f), including the standard "to maintain the minimum water levels and flow necessary to provide adequate water quantity and quality." N.J.S.A. 58:1A-5(e). The conditions in the revised regulation do not interfere with the specific statutory right of agricultural users to divert water for "irrigation, frost protection, harvesting and other agriculturally-related purposes, including aquaculture." N.J.S.A. 58:1A-6(a)(2).
There is nothing in the Water Act, the Farm Act, or the ARDA to suggest that the Legislature intended to give agricultural users unfettered access to the State's water supply. Quite the contrary intent is evident from the language of N.J.S.A. 58:1A-6(a)(2), which requires the county agricultural agents to base their approval of diversion certifications on "standards and procedures established by [DEP]" pursuant to the Water Act. Consequently, we find that the revised regulation is not ultra vires.
In our view, the essence of the revised regulation is that agricultural users are not free to use excessive amounts of water or to use a higher quality of water than is reasonably necessary. We find no basis for concluding that such a requirement is arbitrary, capricious, or unreasonable. We caution, however, that DEP's enforcement of the regulation at issue must take *114 into account the overall legislative intent, discussed above, that regulation of agriculture not be unnecessarily burdensome.

C.
DEP added a new rule, N.J.A.C. 7:20A-1.7(c)(1), that makes certification holders responsible for mitigating all adverse impacts to other certification holders and to ground and surface waters caused by their usage.
As amended, N.J.A.C. 7:20A-1.7 states, in pertinent part, as follows with respect to complaints received by DEP:
(c) [DEP] shall determine the validity of all such complaints. If the complaint appears to be valid, [DEP] shall investigate and make a determination as to cause based upon the facts in each particular case. [DEP] shall notify the complainant, the certification holder, and the appropriate county agricultural agent of its findings and shall, if necessary, direct that a solution be implemented within 30 days.
1. The water usage certification holder is responsible for mitigating adverse impacts on ground or surface waters, the users thereof who had a water supply allocation permit or water usage certification, and/or all authorized users of the ground or surface waters in operation prior to the water usage certification being issued to the water usage certification holder, caused as a direct result of the diversion.
In furtherance of the new provision, DEP now requires a "standard condition" for all water usage certifications that "[t]he certification holder is responsible for mitigating to [DEP]'s satisfaction adverse impacts on ground or surface waters resulting directly from the certification holder's diversion." N.J.A.C. 7:20A-2.6(a)(13).
According to DEP, "[p]rotecting the diversion privileges of existing, authorized users is a prominent objective of the Act and is necessary to ensure those who have depended on such sources can continue to have sufficient access to the water from which they have been granted the privilege to divert." 38 N.J.R. at 2950.
During the comment period, commentors objected that growers who received the required diversion approval from DEP should not be responsible for mitigating adverse impacts because they have no way of foreseeing the future effect of their diversions on surrounding properties, and because DEP is in the best position to ensure that the certifications issued are protective of current and future water resource users. 39 N.J.R. at 40. They also raised questions about how and by whom the remediation requirement would be implemented. 39 N.J.R. at 41.
In response, DEP noted that the new provision provided a mitigation requirement for the agricultural program similar to the existing requirement under the general water supply allocation program under N.J.A.C. 7:19. Ibid. It observed that
[t]here are occasions when an authorized diversion can have impacts on other users and natural resources that were unforeseen at the time of approval. This may be the result of localized anomalies that were not discoverable from soil logs and regional geological maps, or unforeseen precipitation patterns. Because these conditions may not have been understood at the time of the issuance of the water usage certification, the issued certification does not shield the water usage certification holder from resolving adverse impacts resulting from the diversion of water.
[Ibid.]
DEP explained that, in considering any complaints and requests for remediation, it *115 would consider issues such as whether "diversion sources and the alleged impacted source are in the same or connected aquifers, the radius of influence of the diversion source, and an adverse impact such as reducing water levels to such a degree that the impacted well is unable to deliver the amount of water historically available" and whether "the diversion will result in a reduction in flow to such an extent that pre-existing downstream users are unable to utilize water authorized under a[DEP] approval or adversely impact the environment." Ibid. A certification holder could challenge DEP's decision to modify or revoke a certification resulting from an adverse impact determination by requesting an administrative hearing pursuant to N.J.A.C. 7:20A-2.8 (appeal procedure). Ibid.
Finally, DEP stated that any mitigation may include relocating the source to minimize adverse impacts; establishing a series of diversion points to minimize the impact at any one location; managing pumping rates; modifying the duration and timing of the diversion to reduce adverse impacts; implementing conjunctive use of wells or aquifer storage and recovery methods to reduce impacts; reducing the allocation to the amount necessary to resolve the adverse impact; or in the worse case situation where alternatives are not available and impacts are severe, revoking the water usage certification.
[Ibid.]
The revised regulation is worded extremely broadly, especially inasmuch as the term "mitigation" is clearly suggestive of potentially costly actions going well beyond a modification or revocation of the certification holder's diversion rights to resolve a conflict with the rights of a pre-existing permit or certification holder, which is what DEP appears to suggest is all it intends. See, e.g., N.J.A.C. 7:7A-15.1 to -15.26 (setting forth the extensive scope of wetlands "mitigation"). We discern nothing in the Water Act that would authorize DEP to impose a strict liability remedy on a water user beyond modification or, in an appropriate case, revocation of the certification or permit.
Consequently, to the extent the regulation at issue can be read to authorize "mitigation" in the form of payment of damages or costly mitigation plans, it is ultra vires. We do not mean to suggest, however, that the holder of an agricultural certification would be immune from liability based on common law principles or specific, statutorily based remedies. We hold only that DEP cannot impose such broad remedies through regulation not specifically authorized by legislation.
We direct DEP to rewrite the regulation to articulate the remedy it has represented it actually seeks, i.e., the ability to modify or revoke the certification so as to remediate an unforeseen impact by a newly granted certification on the diversion rights of an existing permit or certification holder.

D.
The application procedures for water usage certifications are divided into three subdivisions: (1) general application procedures and requirements, N.J.A.C. 7:20A-2.3; (2) renewal of an existing certification with no modification or only minor modifications, N.J.A.C. 7:20A-2.4; and (3) new certification or renewal with major modifications, N.J.A.C. 7:20A-2.5. In addition, conditions that can be imposed on all water usage certifications are listed in N.J.A.C. 7:20A-2.6.
N.J.A.C. 7:20A-2.3 sets forth the general application procedures for new certifications and renewals. The Bureau *116 challenges three new subsections of this regulation: (1) mapping, N.J.A.C. 7:20A-2.3(e); (2) water quality, N.J.A.C. 7:20A-2.3(f); and (3) requirements concerning applicants in the Delaware River Basin, N.J.A.C. 7:20A-2.3(d).

i.
In applying for a certification, all applicants must now submit a map "with the farm management unit clearly delineated." N.J.A.C. 7:20A-2.3(c). The map must also show "[t]he location of each water diversion source as required." N.J.A.C. 7:20A-2.3(e). The map must be produced from DEP's "internet mapping tool (i-Map) available on [DEP]'s website at www.nj. gov/dep/gis," and it "must be produced at a scale whereby streets and key features are clearly visible." N.J.A.C. 7:20A-2.3(e)(1). In addition,
[d]iversion source locations shall be determined using the Global Positioning System (GPS), [DEP] internet mapping tool (i-Map), a New Jersey licensed land surveyor, or other method meeting [DEP] standards at N.J.A.C. 7:1D, as set forth at N.J.A.C. 7:1D Appendix A, with source locations reported in New Jersey State plane coordinates. The location shall be taken at the well head or intake opening, or if the location cannot be collected at one of those locations, at another location on the subject property, as close as possible to the well head or intake opening.
[N.J.A.C. 7:20A-2.3(e)(2).]
"The applicant and/or water usage certification holder is responsible for the accuracy of all source locations identified in the application." N.J.A.C. 7:20A-2.3(e)(3).
According to DEP, the more specific information now required is needed to
provide more accurate source location data that is essential for enabling [it] to assess potential impacts to other existing users, natural resources, contaminated sites, source water protection areas, saltwater intrusion areas, and areas of critical water supply concern. More accurate locational information will also assist with the location of wells should they be abandoned and require decommissioning.. . . Historically, source location information for issued water usage certifications has been routinely inaccurate, often resulting in reported source locations not on the correct property, and in some cases not located in the same municipality. The provisions proposed in this subsection are intended to remedy this problem.
[38 N.J.R. at 2951.]
During the comment period, commentors objected to the "requirement" that GPS or a surveyor be used, contending that i-Map and aerial photography were "sufficiently accurate" and "most data used by [DEP] is not precise." 39 N.J.R. at 42. They asserted that "the requirement for more accurate source locations is onerous on the water usage certification holder or applicant." Ibid.
We note, initially, that the language at issue does not, in fact, require that GPS or a surveyor be used. They are but two of several methods listed in the alternative. Indeed, DEP stated in its response that it was "cognizant of the cost implications associated with the use of a surveyor" and, therefore, provided other acceptable methods in N.J.A.C. 7:20A-2.3(e)(2). 39 N.J.R. at 43. Specifically, DEP stated that the "rule provides that use of [DEP]'s i-Map tool is sufficient." Ibid.
We do not find the revised requirements to be arbitrary, capricious or unreasonable in light of the fact that DEP is not requiring the use of anything other than i-Map. The use of GPS or a surveyor is permissive rather than mandatory. It is *117 not unreasonable for DEP to require a significant degree of precision with respect to the information on which the decision to grant or withhold a certification is to be based by the county agricultural agent. We find no basis to conclude that the requirement, as worded in the alternative, is unreasonably burdensome to farmers.

ii.
In addition to a map of the source location, an application must now demonstrate that the water requested is the lowest quality appropriate for the intended use. N.J.A.C. 7:20A-2.3(f) states:
The applicant for a water usage certification shall provide information to demonstrate the water to be diverted is the lowest quality water that is appropriate for the intended use.
1. For non-edible crops or other non-edible agricultural [] products, and where determined to be feasible by [DEP], [DEP] may require the use of reclaimed water for beneficial reuse for irrigation or other purposes.
According to DEP, the change was intended "to conserve the highest quality water for potable purposes, consumable agricultural products and to support State planning initiatives." 38 N.J.R. at 2951. DEP explained that groundwater supplies in many regions "are threatened by saltwater intrusion, excessive diversions and contamination." Ibid. Thus, it was "imperative" to "conserve the highest quality water for users that require a high quality water, such as public water supplies and agricultural products primarily intended for human consumption." Ibid. "Where use of lower quality water is appropriate, use of reclaimed water is sound policy and is in the interest of the citizens of the State." Ibid.
During the comment period, commentors asked that DEP make the requirement voluntary, rather than mandatory, until such time as improved scientific tests showing what constituted acceptable or feasible lowest quality water for each type of use have been developed. 39 N.J.R. at 46. They also expressed concern that less than the best water available could adversely affect the soil, ultimate food quality, and public health. 39 N.J.R. at 46-47. Additionally, they expressed concern about additional costs, requesting limits in the rule for distance or costs beyond which reclaimed water would not be deemed feasible. Ibid.
In response, DEP reiterated that, because of concerns with food safety and public health, reclaimed water or water of the lowest quality would not be required for use on edible crops or crops intended for animal feed. 39 N.J.R. at 47. In addition, DEP stated:
If the applicant can demonstrate that the water quality available either through use of reclaimed water for beneficial reuse or through other lower quality water sources may adversely impact soil quality and productivity, [DEP] would not require such use and will consider an alternative water source, if such a source is available.
[Ibid.]
DEP further explained that, when making a decision on what quality of water would be appropriate for the intended use, it would "consider" the availability of alternate water supplies, the economics of the operation, the location of facilities, and the costs of treating any effluent. Ibid. However, it maintained that specific cost and distance standards were too changeable to include in the regulation. 39 N.J.R. at 46.
DEP rejected the suggestion that the rule be made purely voluntary, because "such a system would not likely be successful in implementing the use of reclaimed *118 water for beneficial reuse to any significant degree." 39 N.J.R. at 47. DEP explained that the "key benefit" to the certification holder of using reclaimed water was that it would "more likely . . . have a dependable source of water during periods of drought and will be in a better position to continue irrigating than those depending on natural water systems during these periods." Ibid.
According to DEP, the "key benefit to other users is the maintenance of higher quality water for other purposes including potable supply and enhancement of natural resources." Ibid. Thus, although there would be water quality testing and reporting to ensure reclaimed water met the requirements at N.J.A.C. 7:14 A (Pollutant Discharge Elimination System) for the intended use, the administrative burden on the farmer is "justifiable when the benefits to the State's water resources and water supply needs are considered." Ibid.
We do not find the revised regulatory requirement to be arbitrary, capricious, or unreasonable as written. Given the statutory mandate for DEP "to control, conserve, and manage the water supply of the State and the diversions of that water supply to assure the citizens of the State an adequate supply of water under a variety of conditions," N.J.S.A. 58:1A-5, it is neither unreasonable nor ultra vires for DEP to require efforts to utilize a lower quality of water when feasible and reasonable. For example, there is no reason to allow the use of potable drinking water for agricultural purposes for which it is not necessary, assuming that there is a practical and economical alternative. This is another situation, however, in which DEP's application of the regulation will have to be consistent with the overall legislative intent that regulation of agriculture not be unnecessarily burdensome.

iii.
The revised regulations also require applicants for new and renewed water usage certifications to comply with certain additional general application procedures if they are located in the Delaware River Basin (Basin). 38 N.J.R. at 2951. Qualifying diversions in the Basin area are subject to approval by the Delaware River Basin Commission (DRBC). See N.J.S.A. 32:11D-53.
N.J.A.C. 7:20A-2.3(d) states:
If one or more existing or proposed diversion sources are located within the Delaware River Basin, the applicant or the county agricultural agent shall also:
1. Submit, at the time the water usage certification application is submitted to [DEP], a copy of the application to the [DRBC] . . .; and
2. Provide a copy of the application cover letter sent to DRBC in accordance with (d)1 above, or other proof of filing with the DRBC, to [DEP].
As originally proposed, the rule placed responsibility for submitting the application to the DRBC solely on the county agricultural agent. 38 N.J.R. at 2951, 2961. Commentors expressed concerns that county agricultural agents were "already overburdened and cannot absorb the additional costs," suggesting that "the DRBC obtain the information directly." 39 N.J.R. at 45.
Upon adoption, DEP modified N.J.A.C. 7:20A-2.3(d) by requiring that either "the applicant or the county agricultural agent" would be responsible for submitting the application to the DRBC. Ibid. DEP asserted that it was "the [ultimate] responsibility of the applicant to ensure all applications are submitted and required approvals are received prior to diverting water for agricultural purposes." Ibid. The rule, *119 however, still allowed "those county agricultural agents who take a broader role in assisting their clients to submit the required information and documentation." Ibid.
We are not persuaded by the Bureau's argument that this requirement is ultra vires simply because a provision of the Delaware River Basin Compact, N.J.S.A. 32:11D-57, requires the member states to preserve records of authorized diversions of water and supply copies at the Commission's request. The requirement that the applicant or the county agent forward a copy of the application to the Commission is not arbitrary, capricious or unreasonable.

E.
N.J.A.C. 7:20A-2.4 sets forth the procedures for renewing an existing water usage certification with no modification or only minor modifications. The Bureau challenges three new subsections of this regulation: (1) three-month submission time, N.J.A.C. 7:20A-2.4(a)(1); (2) impervious surface disclosure, N.J.A.C. 7:20A-2.4(b)(2); and (3) agricultural development plan, N.J.A.C. 7:20A-2.4(d).

i.
The revised regulations now require that renewals of water usage certifications with no modification or only minor modifications be submitted at least three months before expiration. N.J.A.C. 7:20A-2.4(a) states:
(a) Renewals with no or minor modifications, as identified in N.J.A.C. 7:20A-2.2(b), shall be processed in accordance with this section. Renewals with major modifications shall be processed in accordance with N.J.A.C. 7:20A-2.5.
1. An application for renewal of a current water usage certification shall be submitted to the appropriate county agricultural agent at least three months prior to the expiration date of the existing certification.
2. An applicant for renewal of a current water usage certification shall submit the appropriate application forms and other information as requested by [DEP] for the proper implementation of the Act and this chapter.
3. If the certification holder does not comply with (a)1 and 2 above, [DEP] may:
i. Notify the certification holder by certified mail that the permit has expired;
ii. Take appropriate enforcement action including the assessment of penalties under N.J.A.C. 7:19-18; and/or
iii. Require the certification holder to file an application as a new applicant in accordance with this chapter.
4. A current water usage certification for which a complete renewal application package has been submitted to the county agricultural agent three months prior to the expiration date shall remain in effect until [DEP] grants or denies the renewal application.
According to DEP, "[i]t [was] imperative that a certification holder submit a renewal application in a timely fashion in order to retain their diversion privileges." 38 N.J.R. at 2951. Because water supplies in additional regions had become "stressed," DEP concluded that "the enhanced renewal application requirements will highlight the need for certification holders to responsibly submit renewal applications in a timely fashion, and raise awareness about the potential risk of losing their diversion privileges if they do not." Ibid.
During the comment period, commentors expressed concern about "the length *120 of time required to obtain a water usage certification." 39 N.J.R. at 50. They complained that "it currently takes years to obtain a decision from [DEP]." Ibid. They noted that there was no corresponding time constraint on DEP for issuing new and renewed certifications.
In response, DEP explained that the three-month requirement ensured that it would receive "the renewal application in sufficient time to maintain the existing certification in effect," noting that, in the past, it had "not received a renewal application prior to the expiration of the existing certification," as a consequence of which "the certification could be terminated and the water diversion privileges relinquished." Ibid.
DEP maintained that it "makes every effort to issue decisions within a reasonable period of time . . . [, that is,] within [eighteen] months on new or major modification applications, and within six months for renewals." Ibid. It noted, however, that "quite often [DEP] staffing constraints, incomplete applications, delayed submittal of required information by the applicant, significant natural resource issues, and public opposition to an application delay the issuance of a decision." Ibid.
We do not find the three-month requirement to be arbitrary, capricious, or unreasonable. The certification need only be renewed once every five years. As we understand DEP's response to the comments, if a renewal application is submitted on a timely basis, the holder is allowed to continue diversion pending review and approval of the renewal application. We will not second-guess DEP on the issue of whether a shorter period would have been more appropriate.

ii.
Another new provision in N.J.A.C. 7:20A-1.2(c), quoted above, is the requirement that the applicant provide "the amount of impervious surface on the farm management unit."[7] Consequently, in addition to the application requirements in N.J.A.C. 7:20A-2.3, applicants for renewals of water usage certifications with no modification or only minor modifications must submit information of
[t]he total number of acres owned or operated for agricultural [] purposes, the number of acres actively being farmed or otherwise utilized for agricultural [] purposes, the U.S. Department of Agriculture soil mapping unit, the amount of impervious surface in acres currently on the farm management unit and/or planned in the future, the acreage planted in each crop, and the number of acres of each crop under irrigation[.]
[N.J.A.C. 7:20A-2.4(b)(2).]
According to DEP, "[c]hanging agricultural practices in New Jersey [were] resulting in additional impervious surfaces through increased use of impermeable plastic ground cover, greenhouses, and other agriculture-related structures." 38 N.J.R. at 2948. "Impervious surface reduces the recharge capability of the site and impacts surface water quality and ground water levels." Ibid. It explained:

*121 Agricultural [] activities resulting in significant impervious surface often have greater adverse impacts on water resources than those enterprises that leave the ground open to absorb precipitation and control run off. Various studies comparing the impacts of impervious surface on water quality suggest that when impervious surface exceeds ten percent of the watershed, water quality impairments become evident. Where extensive (greater than ten percent) impervious surface exists or is planned for the farm management unit, [DEP] may include additional conditions in a water usage certification, such as the use of reclaimed water for beneficial re-use, the increased use of stormwater capture, and the use of more efficient irrigation practices.
[38 N.J.R. at 2952.]
During the comment period, there were objections that impervious surface was "not a factor in calculating water needed for crop types and [that] its calculation is burdensome for the county agricultural agents." 39 N.J.R. at 47. "Impervious surface requirements have little to do with water usage and vary from farm to farm as do agricultural development plans. Best management practices will mitigate any adverse impacts caused by impervious surface." Ibid.
In response, DEP stated that it would consider the amount of impervious surface planned for a farm management unit to determine if the capture of precipitation run-off would be a viable source of water to satisfy the lowest quality water determination or could also preclude the need to divert from other water sources, such as ground or surface waters. Ibid. "Research indicates that the amount of impervious surface on a regional basis impacts recharge and infiltration, and impacts water quality by reducing infiltration and increasing run-off." Ibid.
We do not find the requirement to be arbitrary, capricious, or unreasonable. While the amount of impervious surface may not be directly relevant to the user's calculation of the amount of water needed, DEP has articulated a reasonable need for the information for the determination of whether there are other feasible sources of water, such as runoff recovery. Such an inquiry is consistent with DEP's obligation "to control, conserve, and manage the water supply of the State and the diversions of that water supply to assure the citizens of the State an adequate supply of water under a variety of conditions." N.J.S.A. 58:1A-5. Of course, the regulation must be reasonably applied.

iii.
Upon receiving a completed application for renewal of a water usage certification with no modification or minor modifications, the revised regulations now require the county agricultural agent to "calculate a water allocation adequate to meet the applicant's water usage requirements" based upon the information in the application and "the agent's knowledge of agriculture []." N.J.A.C. 7:20A-2.4(d). The standards for determining the amount of water necessary to meet the needs of an activity are set forth in N.J.A.C. 7:20A-2.4(d)(1):
The amount of water requested shall be limited to the type of crop under cultivation, and the area in acres of the farm management unit actually under cultivation, or where there is a formal written agricultural development plan or an alternate plan pursuant to [N.J.A.C. 7:20A-2.4](d)4 below, the amount of water requested shall be based on future use or expansion into non-cultivated areas during the effective term of the water *122 usage certification. If upon renewal of the water usage certification, the amount of water allocated has not been utilized or the area in the agricultural development plan or an alternate plan pursuant to [N.J.A.C. 7:20A-2.4](d)4 below has not been cultivated in accordance with the plan, [DEP] may reduce the amount of water in accordance with [the procedures in N.J.A.C. 7:20A-2.4](h) below in the water usage certification that had been allocated to that area or for that purpose.
Accordingly, the applications must now include an "agricultural development plan," N.J.A.C. 7:20A-2.4(d)(3), which is
a plan for identifying crop types anticipated to be planted, anticipated for the expansion of agricultural or horticultural activities into areas of the farm management unit currently not cultivated and/or irrigated, and/or the amount of impervious surface planned on the farm management unit during the effective period of the water usage certification.
[N.J.A.C. 7:20A-1.3.]
That plan must include "at a minimum": (1) a map of the farm management unit designating existing and planned cultivated areas; (2) a listing by acre of crop types currently cultivated and irrigated; and (3) a listing of crop types planned to be cultivated and irrigated. N.J.A.C. 7:20A-2.4(d)(2)(i) through (iv).
An alternative to submission of an agricultural development plan is set forth in N.J.A.C. 7:20A-2.4(d)(4):
In lieu of the agricultural development plan . . ., [DEP] will accept a water management plan developed in cooperation with the United States Department of Agriculture, Natural Resources Conservation Service (NCRS) or other similar water conservation plan, if such plan meets, as determined by [DEP], the requirements at [N.J.A.C. 7:20A-2.4](d)2 above sufficient to enable [DEP] to make a determination regarding the amount of unused allocation to be included in the water usage certification.
According to DEP, there are "a significant number" of certification holders using "much less than the amount of water allocated" in their current certifications. 38 N.J.R. at 2948, 2952. "This may result in other . . . users being denied a new certification or an increase in their existing certification because when water allocated is assessed on a regional basis, the results typically show that the water resource is near or exceeding sustainability." Id. at 2952. To make distribution of available water "more equitable," which is consistent with the Water Act, DEP may reduce the amount of water allocated in the renewed certification. Id. at 2948, 2952. An agricultural development plan will address the issue of unused water in a certification by having the holder develop and implement a plan that confirms the water allocated is "reasonable and appropriate." Id. at 2952.
During the comment period, there were objections that the additional reporting and renewal requirements were excessive, expensive, and resulted in more paperwork. 39 N.J.R. at 44, 51. In addition, commentors urged that agricultural development plans not be required from all users, but only be used when requesting an allocation substantially beyond the current cultivated acreage need. Id. at 43. "[A]gricultural usage may change from season to season and in response to changes in the market, for example, when an agricultural operation changes from soybeans to tomatoes." Ibid. Future crops may require more intense irrigation, which might not happen if DEP reduces permitted diversion. Ibid. "Reductions in allocation may limit crop rotation flexibility, which a farm must have to maximize profit and which may not be possible to *123 project over a five year period." Ibid. Furthermore, farmers might not employ more efficient water conservation measures, since reducing usage might result in renewals with lower allocations. Id. at 44.
In response, DEP declared that it "recognizes the economic forces challenging the agriculture industry and has attempted to balance the need for information to effectively manage the water resources for the benefit of the people of the State and to protect natural environments, with the economic realities of agriculture." 39 N.J.R. at 51. The requirements "do not place an unreasonable burden on the agriculture industry," ibid., and the additional costs of preparing an agricultural development plan will not be excessive. Id. at 44.
Furthermore, DEP promised to "work with the water usage certification holder and the county agricultural agent to assess potential impacts of the diversions to minimize any need for a consultant." Ibid. DEP "may" also accept other similar water conservation plans, such as a water management plan, "as an alternative to the agricultural development plan." Ibid.
DEP further explained in its responses that it "will review water usage to ensure that water is not being diverted simply to maintain the level of allocation in the water usage certification," i.e., water that is being applied to non-target areas or for non-approved purposes. Ibid. When making its decision on including the unused portion of the allocation in the water usage certification, DEP will therefore consider consistency with the plan, crop types, current irrigated acreage, unforeseen events such as precipitation anomalies during the effective term of the certification, changes in the marketplace, reasonable future expectations for crop changes and irrigation needs, and other extenuating circumstances that may have affected water use. 39 N.J.R. at 51. It was "imperative" to DEP that it "ensure water supplies are equitably distributed amongst the various user groups." 39 N.J.R. at 43. Unused water supplies "may adversely impact others who may be denied a water allocation." Ibid.
In essence, DEP is asking applicants who are seeking the right to divert water for agricultural purposes during a five year period to specify how the water will be used over the five years of that period, including information about anticipated future changes in usage. This does not appear, on its face, to be an unreasonable or burdensome request. Consequently, we do not find the requirement to be arbitrary, capricious or unreasonable. Nevertheless, DEP's application of the regulation in practice will have to be consistent with the overall legislative intent that regulation of agriculture not be unnecessarily burdensome.

F.
N.J.A.C. 7:20A-2.5 sets forth the procedures for obtaining new water usage certification, renewing existing certification with major modifications, or modifying existing certifications. The Bureau challenges the new requirement that the applicant submit a wetlands impact study, N.J.A.C. 7:20A-2.5(a)(11)(v).
N.J.A.C. 7:20A-2.5(a)(11) requires such applicants to submit:
Sufficient information to demonstrate that under standard operating conditions:
i. The diversion of the quantity of water requested shall not unduly interfere with other existing diversions;
ii. The diversion shall not exceed the natural replenishment or safe yield of a water resource or threaten to exhaust the water resource or to render it unfit for use;

*124 iii. In the case of a ground water diversion, the diversion shall not cause an increase in saltwater intrusion that renders the water resource unfit for use; shall not spread ground water contamination; and shall not interfere with any ground water remediation plan or activity;
iv. The diversion shall not reduce the dry season flow or level of a river, stream, lake, or pond so as to adversely affect sanitary conditions downstream, ecologically based flows as determined by [DEP], or otherwise unduly injure public or private interests, including the maintenance of fish life; and
v. The diversion shall not reduce surface flow or water levels of freshwater wetlands so as to adversely affect the viability of the wetland to support sustainable and diverse flora and fauna populations, or adversely impact the wetlands functions and values as determined by [DEP].
The Bureau specifically objects to subpart v.
According to DEP, "freshwater wetlands are a significant component" of the State's water resources and "play a major role in enhancing water quality and providing wildlife habitat." 38 N.J.R. at 2954. "Diminishing these valuable natural resources by denying them the water necessary for their sustenance is not in the public interest nor is it protective of the State's water resources." Ibid.
The amended regulation specifically addresses the preservation of "flora and fauna populations." While we note that the additional requirement seeks to balance between the use of ground water for agricultural purposes and the State's ongoing efforts to support New Jersey's wetlands, our concern with the revised requirement is that it appears to introduce concepts from the Freshwater Wetlands Protection Act (Wetlands Act), N.J.S.A. 13:9B-1 to -30, into the enforcement of the Water Act without a legislative mandate to do so.
The Wetlands Act establishes a permit system for "regulated activit[ies]" in or near freshwater wetlands, which activities include the "drainage or disturbance of the water level or water table." N.J.S.A. 13:9B-3. The difficulty is that the Wetlands Act provides an exemption from its permitting requirements for "[n]ormal farming, silviculture, and ranching activities such as plowing, seeding, [and] cultivating." N.J.S.A. 13:9B-4(a). Although not specifically listed, irrigation would certainly appear to be a "normal farming activity."
We also note that N.J.S.A. 13:9B-30 expresses the Legislature's general intent that the Wetlands Act "constitute the only program for [] regulation [of freshwater wetlands] in the State," with an exception not applicable here. Although we recognize that this section is primarily concerned with precluding regulation by local government entities, it sets forth a specific legislative intent to control the regulation of wetlands through specific statutory enactments.
Both the Water Act and the Wetlands Act embody the State's public policy that the State's water supply be protected. See N.J.S.A. 58:1A-2; N.J.S.A. 13:9B-2. At the same time, both acts, together with the Farm Act and the ARDA, reflect the Legislature's intention not to impose unnecessary regulatory burdens on agricultural activities, as discussed at length above.
The Legislature recently "reaffirm[ed]" its commitment to the Farm Act in its legislative findings for the Highlands Water Protection and Planning Act (Highlands Act), N.J.S.A. 13:20-1 to -35.

*125 The Legislature further finds and declares that there are approximately 110,000 acres of agricultural lands in active production in the New Jersey Highlands; that these lands are important resources of the State that should be preserved; that the agricultural industry in the region is a vital component of the economy, welfare, and cultural landscape of the Garden State; and, that in order to preserve the agricultural industry in the region, it is necessary and important to recognize and reaffirm the goals, purposes, policies, and provisions of the "Right to Farm Act," . . . ( [N.J.S.A.] 4:1C-1 [to -10.4].) and the protections afforded to farmers thereby.
[N.J.S.A. 13:20-2.]
The Highlands Act also expresses concerns about wetlands and water resources.
The Legislature further finds and declares that the New Jersey Highlands is an essential source of drinking water, providing clean and plentiful drinking water for one-half of the State's population, including communities beyond the New Jersey Highlands, from only [thirteen] percent of the State's land area; that the New Jersey Highlands contains other exceptional natural resources such as clean air, contiguous forest lands, wetlands, pristine watersheds, and habitat for fauna and flora, includes many sites of historic significance, and provides abundant recreational opportunities for the citizens of the State.
[N.J.S.A. 13:20-2]
The goals of the Highlands Act include the preservation of water resources, agricultural uses, and wetlands. N.J.S.A. 13:20-10(b). It also confers specific authority on DEP for enhanced regulation by DEP with respect to freshwater wetlands and water diversion. See N.J.S.A. 13:20-32(c).
We conclude that DEP's regulatory amendment introducing specific wetlands protection requirements into its enforcement of the Water Act is ultra vires. The Wetlands Act has a specific exemption for farming activities, while the Water Act has no specific mandate with respect to wetlands "flora and fauna." An administrative agency cannot give a statute greater effect than its language allows under the guise of interpretation. In re Freshwater Wetlands, supra, 180 N.J. at 489, 852 A.2d 1083. If wetlands protection is to be effectuated through the regulation of farming under the Water Act, it must be done on the basis of specific legislative authority. This is an issue on which public policy must be set in the first instance by the Legislature.

G.
The Bureau challenges two subsections of N.J.A.C. 7:20A-2.6(a) that set forth "standard conditions" for all water usage certifications.
N.J.A.C. 7:20A-2.6(a)(9) originally imposed the condition that any diversion privilege that was unused, or not reasonably required for a demonstrated future need, "shall" revert back to the State upon renewal or modification. 38 N.J.R. at 2965. DEP amended N.J.A.C. 7:20A-2.6(a)(9) (emphasis added) to impose the condition that
if the authorized diversion privileges are not currently utilized, or are not reasonably required for a demonstrated future need, as described in the agriculture development plan developed pursuant to N.J.A.C. 7:20A-2.4(d)1 through 3, they shall, all or in part, revert back to the State upon renewal or modification of the certification as determined by [DEP][.]
According to DEP, "water not currently being utilized or not reasonably required for future use, as described in the agricultural *126 development plan, [should] revert back to the State. . . ." 38 N.J.R. at 2955. It explained that "the amount of water allocated in a water usage certification" should be reduced "when there is no demonstrated need for that water to ensure equity among various water users and to ensure there is sufficient water in certain areas to meet ecological and natural resource needs." Ibid.
We see nothing arbitrary, capricious, or unreasonable in that requirement, assuming, of course, that DEP complies with any applicable notice and hearing requirements of N.J.S.A. 58:1A-7(b). The regulation is a proper exercise of the Water Act's mandate, found in N.J.S.A. 58:1A-2, that DEP maintain the quantity of the State's waters. In fact, the Act specifically authorizes DEP in reviewing a water usage certification to "limit" the quantity of water allowed to the amount "currently diverted" or "reasonably required for a demonstrated future need." N.J.S.A. 58:1A-7(b).
While we understand that farmers have a need for flexibility in the amount of water available to them depending on crop rotation and weather conditions, it does not follow that they should be able to retain the right to use more water than that for which they are reasonably able to demonstrate a need, based upon either past usage or future projections supported by their agricultural plan, or both.
N.J.A.C. 7:20A-2.6(a)(13) requires that the mitigation obligation, discussed above, be included as a standard condition. Once the mitigation provisions of N.J.A.C. 7:20A-1.7(c)(1) have been rewritten as we have required, the inclusion of that requirement as a general condition is not unreasonable or ultra vires.

H.
We have considered each of Bureau's remaining arguments in light of the record and applicable law. We are satisfied that the arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

IV.
In summary, we uphold DEP's readaption of and amendments to N.J.A.C. 7:20A, with four exceptions. We find that N.J.A.C. 7:20A-1.3, N.J.A.C. 7:20A-2.3(j), and N.J.A.C. 7:20A-2.5(a)(11)(v) are ultra vires and unenforceable. We find that N.J.A.C. 7:20A-1.7(c)(1) is ultra vires as written, but may be rewritten as set forth in this opinion so as to be an appropriate exercise of the regulatory authority conferred on DEP by the Water Act.
Affirmed in part and reversed in part.
NOTES
[1] "Agricultural, aquacultural, or horticultural purposes" is defined as "the commercial activity of producing principally for sale aquatic organisms, crops, plants, animals or their products for the use or consumption by humans and/or animals including the growing, harvesting, storage and the on-farm preparation for use and marketing of aquatic organisms, crops, plants, animals or their products." N.J.A.C. 7:20A-1.3. For the sake of convenience, use of the term "agricultural" in this opinion will include all three purposes.
[2] L. 1981, c. 262
[3] The "[c]ounty agricultural agent" is "the person so appointed by the New Jersey Agricultural Experiment Station's Rutgers Cooperative Research and Extension." N.J.A.C. 7:20A-1.3.
[4] This section of the Act was not specifically amended to reflect the role of the agricultural agent in approving certifications for farm use. We have no reason to believe, however, that the Legislature did not intend the change effectuated by L. 1981, c. 277, to apply to certification renewals. However, that issue is not specifically before us.
[5] Registrations allow for diversions of less than 100,000 gallons per day for agricultural use. N.J.A.C. 7:20A-3.2(b).
[6] "Farm management unit" is defined as "a parcel or parcels of land, whether contiguous or noncontiguous, together with agricultural [] buildings, structures and facilities, producing agricultural [] products, and operated under common ownership or by a common authorized representative . . . reflected by lot and block numbers, or metes and bounds." N.J.A.C. 7:20A-1.3.
[7] "Impervious surface" is defined as:

any structure or surface that prevents the infiltration of precipitation into the land. Examples of impervious surfaces include, but are not limited to, pavement, roof tops, sidewalks, driveways, barns, hoop houses, greenhouses, plastic or other impermeable ground cover, sheds, foundations, houses, garages, commercial buildings, compacted soil or stone areas, and lined ponds. This term shall not include temporary structures that remain in place for less than six months per calendar year.
[N.J.A.C. 7:20A-1.3.]