852 A.2d 1083

IN THE MATTER OF FRESHWATER WETLANDS
PROTECTION ACT RULES.

Argued December 1, 2003—Decided July 26, 2004.

480

*Paul H. Schneider,* argued the cause for appellant, New Jersey Builders Association (*Giordano, Halleran & Ciesla,* attorneys; *Michael J. Gross,* of counsel; *Mr. Schneider* and *Steven M. Dalton,* on the briefs).

*Rachel J. Horowitz,* Deputy Attorney General, argued the cause for respondent, New Jersey Department of Environmental Protection, (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Deputy Attorney General, of counsel).

*Thomas A. Borden,* submitted a brief on behalf of *amici curiae,* Association of New Jersey Environmental Commissions, New Jersey Audubon Society, NY/NJ Baykeeper, Hackensack Riverkeeper and New Jersey Environmental Lobby.

Justice WALLACE delivered the opinion of the Court.

In this appeal we determine the validity of certain rules adopted by the New Jersey Department of Environmental Protection (DEP) under the Freshwater Wetlands Protection Act (Act), *N.J.S.A.* 13:9B–1 to –30. The New Jersey Builders Association (Builders Association) asserts that DEP exceeded its authority under the Act by adopting rules to restrict (1) residential construction near "transition areas," which are buffer zones surrounding freshwater wetlands; and (2) activities near "vernal habitats," which are areas of habitat for vernal species. The Appellate Division affirmed the rules at issue. We granted certification, 177 *N.J.* 221, 827 *A.2d* 288 (2003), and now reverse. We hold that the rules exceed DEP's statutory authority under the Act.

## I.

In 1987, the Legislature passed the Act to provide a comprehensive scheme for the regulation and protection of New Jersey's freshwater wetlands. *N.J.S.A.* 13:9B–2; *MCG Assocs. v. DEP,* 278 *N.J.Super.* 108, 111, 650 *A.2d* 797, 798 (App.Div.1994); *M. Alfieri Co. v. State,* 269 *N.J.Super.* 545, 548, 636 *A.2d* 87, 89 (App.Div.1994), *aff'd o.b.,* 138 *N.J.* 642, 651 *A.2d* 99 (1995). The Legislature declared that its policy was "to preserve the purity and integrity of freshwater wetlands from random, unnecessary or undesirable alteration or disturbance." *N.J.S.A.* 13:9B–2. It sought to maintain a delicate balance between environmental interests and the rights of property owners. *Ibid.*

When the Act was passed, the United States Army Corps of Engineers (the Corps) regulated the "discharge of dredged or fill material" into New Jersey's freshwater wetlands pursuant to section 404 of the federal Clean Water Act (CWA), 33 *U.S.C.A.* § 1344. *MCG Assocs., supra,* 278 *N.J.Super.* at 111, 650 *A.2d* at 798. The CWA authorized states to assume the regulatory responsibilities of the federal program, 33 *U.S.C.A.* §§ 1344(g)–1344(h), provided the state program was "as stringent as the federal program and ... compl[ied] with all the requirements of the federal regulations," *In re Freshwater Wetlands Prot. Act Rules,* 238 *N.J.Super.* 516, 520, 570 *A.2d* 435, 437 (App.Div.1989) (*In re FWPA Rules*). As a result, the Legislature passed the Act to regulate all activities in the freshwater wetlands and to assume the Corp's regulatory functions. *N.J.S.A.* 13:9B–2; *In re FWPA Rules, supra,* 238 *N.J.Super.* at 520, 570 *A.2d* at 437.

The program instituted by the Act is similar to the CWA, but it includes several key differences that afford greater protection for wetlands. 33 *N.J.R.* 3045, 3118–20 (Sept. 4, 2001); *see generally N.J.S.A.* 13:9B–3 (defining "regulated activity"). In *MCG Assocs., supra,* the Appellate Division summarized those differences:

First, the federal statute authorizes federal regulation of wetlands which are adjacent to or part of the "waters of the United States" or wetlands the degradation of which might affect interstate commerce. No similar restriction appears in the Act, and thus DEP has the authority to regulate more wetlands.

Second, [the] Act regulates more activities. The federal program requires a permit for the "discharge of dredged or fill material into the navigable waters" of the United States. 33 *U.S.C.* § 1344(a). Thus, while a developer needs a permit to fill in a wetland, no federal permit is required to take material out of a wetland.... [The] Act is much more comprehensive, requiring a permit to fill, drain, remove any soil, disturb the soil in any way, drive pilings, place obstructions, or destroy plant life which would alter the character of the wetland. *N.J.S.A.* 13:9B–3 (definition of "regulated activity").

Finally, ... the [Federal Environmental Protection Agency (EPA)] and the Corps lack authority to regulate land adjacent to wetlands, such as a buffer area between the wetland and the adjoining upland. [The] Act mandates buffers around wetlands, called transition areas, to protect wildlife and minimize the impact of development.

[278 *N.J.Super.* at 112–13, 650 *A.2d* at 799 (some citations omitted).]

The Attorney General and DEP are responsible for assuming jurisdiction over the federal permit program. *N.J.S.A.* 13:9B–27a.

A. *Regulated Activities, Residential Development Projects, and Transition Areas, N.J.A.C. 7:7A–1.4, –2.2(a)7, –2.6(a)6*

A freshwater wetland is "an area that is inundated or saturated by surface water or groundwater" sufficient to support "vegetation typically adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation." *N.J.S.A.* 13:9B–3. To engage in regulated activities in freshwater wetlands a permit is required. *N.J.S.A.* 13:9B–3, –9a, –23. There are six regulated activities:

(1) The removal, excavation, disturbance or dredging of soil, sand, gravel, or aggregate material of any kind;

(2) The drainage or disturbance of the water level or water table;

(3) The dumping, discharging or filling with any materials;

(4) The driving of pilings;

(5) The placing of obstructions; [and]

(6) The destruction of plant life which would alter the character of a freshwater wetland, including the cutting of trees.

[*N.J.S.A.* 13:9B–3.]

In addition to regulating those activities, the Act provides for "transition areas" surrounding certain categories of freshwater wetlands, and prohibits activities in those areas. *N.J.S.A.* 13:9B–3, –16, –17. A "transition area" is "an area of land adjacent to a freshwater wetland which minimizes adverse impacts on the wetland or serves as an integral component of the wetlands ecosystem." *N.J.S.A.* 13:9B–3. Transition areas serve as:

(1) An ecological transition zone from uplands to freshwater wetlands which is an integral portion of the freshwater wetlands ecosystem, providing temporary refuge for freshwater wetlands fauna during high water episodes, critical habitat for animals dependent upon but not resident in freshwater wetlands, and slight variations of freshwater wetland boundaries over time due to hydrologic or climatologic effects; and

(2) A sediment and storm water control zone to reduce the impacts of development upon freshwater wetlands and freshwater wetlands species.

[*N.J.S.A.* 13:9B–16a.]

Those areas receive no protection under the CWA. 33 *N.J.R.* at 3119.

Transition areas are required for freshwater wetlands of "exceptional resource value" and of "intermediate resource value," but not for those of "ordinary resource value." *N.J.S.A.* 13:9B–16a. Freshwater wetlands of "exceptional resource value" are defined as wetlands that "discharge into ... trout production waters and their tributaries" or provide "habitats for threatened or endangered species." *N.J.S.A.* 13:9B–7a. Freshwater wetlands of "ordinary value" are defined as wetlands that "do not exhibit the characteristics [for wetlands of exceptional resource value] and which are certain isolated wetlands, man-made drainage ditches, swales, or detention facilities." *N.J.S.A.* 13:9B–7b. Freshwater wetlands of "intermediate resource value" are defined as "freshwater wetlands not [of exceptional value] or [of ordinary value]." *N.J.S.A.* 13:9B–7c.

The size of a transition area depends on the value of the freshwater wetland to which it is adjacent. For a freshwater wetland of "exceptional resource value" the transition area may be "[n]o greater than 150 feet nor less than 75 feet," *N.J.S.A.* 13:9B–16b(1), while the transition area for a freshwater wetland of "intermediate resource value" may be "[n]o greater than 50 feet nor less than 25 feet," *N.J.S.A.* 13:9B–16b(2).

"[E]xcept for normal property maintenance or minor and temporary disturbances ... resulting from ... normal construction activities," or unless a waiver is obtained, the following activities are expressly prohibited in transition areas:

(1) Removal, excavation, or disturbance of the soil;

(2) Dumping or filling with any materials;

(3) Erection of structures, except for temporary structures of 150 square feet or less;

(4) Placement of pavements;

(5) Destruction of plant life which would alter the existing pattern of vegetation. [*N.J.S.A.* 13:9B–17a.]

DEP adopted rules [1] implementing the Act in 1988 and adopted additional provisions governing transition areas in 1989. 32

---

[1] DEP's rules implementing the Act are codified at *N.J.A.C.* 7:7A–1.1 to –17.1.

*N.J.R.* 2693, 2694 (Aug. 7, 2000). The rules were amended in 1992 primarily to allow DEP to qualify to replace the Corps as the authority to issue permits. *Ibid.* It was not until March 1994, however, that DEP actually assumed permitting authority. *Ibid.*

In August 2000, DEP proposed a comprehensive readoption of the rules with amendments that became effective in September 2001. 33 *N.J.R.* at 3045. One part of the rules now under challenge concerns the definition and application of a "residential development project" within the wetlands area and any adjoining transition areas. *N.J.A.C.* 7:7A–1.4, –2.2(a)7, –2.6(a)6. The rules define a "residential development project" as "the construction of a new structure for residential use and the area within 20 feet of the structure on all sides, measured outward from the outside edge of the foundation of the structure." *N.J.A.C.* 7:7A–1.4.

In addition to the regulated activities for freshwater wetlands contained in the Act, DEP also sought to regulate the "[p]lacement of any portion of a residential development project" in any category of freshwater wetland, *N.J.A.C.* 7:7A–2.2(a)7, or in or near any transition area, *N.J.A.C.* 7:7A–2.6(a)6. For simplification, we refer to the definition of "residential development project" contained in *N.J.A.C.* 7:7A–1.4, along with *N.J.A.C.* 7:7A–2.2(a)7, and *N.J.A.C.* 7:7A–2.6(a)6, as the RDP Rules. The effect of the RDP Rules was the expansion of the width of transition areas for wetlands adjacent to structures by an additional twenty feet.

In a series of statements and responses to commenters, DEP defended the RDP Rules by asserting that based on its vast experience it was inevitable that the activities of home owners would spill from their land either into a freshwater wetland of ordinary value or into the transition areas surrounding freshwater wetlands of intermediate and exceptional resource value. 32 *N.J.R.* at 2697–98. DEP considered the cost of policing and eradicating those violations on a case-by-case basis as prohibitive and preemptively sought to prevent such violations through the RDP Rules. *Ibid.*

## B. *General Permits and Vernal Habitats, N.J.A.C. 7:7A–4.3(b)16*

DEP's assumed responsibilities include the issuance of general permits to allow regulated activities in freshwater wetlands. *N.J.S.A.* 13:9B–23. Pursuant to *N.J.S.A.* 13:9B–23a, DEP is authorized to adopt any Nationwide Permit previously issued under the CWA by the Corps. The Act also mandates that:

> [DEP] *shall* issue a general permit for an activity in a freshwater wetland [i.] which is not a *surface water tributary system* discharging into an inland lake or pond, or a river or stream, and [ii.] which would not result in the loss or substantial modification of *more than one acre of freshwater wetland,* provided that this activity will not take place in a freshwater wetland of *exceptional resource value.* [DEP] shall issue a general permit for a regulated activity in a freshwater wetland located in an area considered a headwater pursuant to the [CWA] if the regulated activity would not result in the loss or substantial modification of more than one acre of a swale or a man-made drainage ditch. The provisions of this subsection shall not apply to any wetlands designated as priority wetlands by the [EPA].
>
> [*N.J.S.A.* 13:9B–23b (emphasis added).]

A wetland is "[p]art of a surface water tributary system" if it is

> connected to a surface water that discharges into a lake, pond, river, stream or other surface water feature. The connection may be through any surface water feature, whether regulated or not, including a stormwater or drainage pipe.... Wetlands adjacent to a surface water are connected to the surface water and are part of the surface water tributary system.
>
> [*N.J.A.C.* 7:7A–1.4.]

"Isolated wetlands" are defined as a "freshwater wetland that is not 'part of a surface water tributary system,'" *id.,* and "surface waters," are defined as any above-ground water of the State except for groundwater, including "the ocean and its tributaries, all springs, streams, rivers, lakes, ponds, wetlands, and artificial waterbodies," *N.J.A.C.* 7:9B–1.4. Thus, *N.J.S.A.* 13:9B–23b is concerned with "isolated wetlands."

*N.J.S.A.* 13:9B–23c authorizes DEP to issue additional general permits for certain enumerated categories of activities, if it determines that:

> the activities will cause only minimal adverse environmental impacts when performed separately, will have only minimal cumulative adverse impacts on the environment, will cause only minor impacts on freshwater wetlands, will be in conformance with the purposes of [the Act], and will not violate any provision of the [CWA].

Finally, *N.J.S.A.* 13:9B–23d authorizes DEP to modify or rescind general permits under certain conditions.

[DEP] may, on the basis of findings with respect to a specific application, modify a general permit issued pursuant to this section by adding special conditions. [DEP] may rescind a general permit and require an application for an individual permit if the commissioner finds that additional permit conditions would not be sufficient and that special circumstances make this action necessary to insure compliance with [the Act] or the [CWA].

[*Ibid.*]

General Permit 6 (GP 6), codified at *N.J.A.C.* 7:7A–5.6, is the isolated wetlands general permit required by DEP pursuant to *N.J.S.A.* 13:9B–23b. GP 6 "authorizes regulated activities in freshwater wetlands, transition areas adjacent to those wetlands, and/or State open waters, if the freshwater wetlands and/or State open waters are not part of a surface water tributary system discharging into an inland lake or pond, or a river or stream." *N.J.A.C.* 7:7A–5.6(a).

A prior rule prohibited any GP 6 activity in "vernal habitats." *N.J.A.C.* 7:7A–5.6(c)5. However, that rule was deleted and a new rule was adopted directing that any activity "authorized under a general permit shall not take place in a vernal habitat, ... or in a transition area adjacent [thereto]." *N.J.A.C.* 7:7A–4.3(b)16. A vernal habitat is defined as a wetland that (1) "[o]ccurs in a confined basin depression without a permanent flowing outlet;" (2) "[f]eatures evidence of breeding by one or more species of fauna adapted to reproduce in ephemeral aquatic conditions"; (3) "[m]aintains ponded water for at least two continuous months between March and September of a normal rainfall year; and" (4) "[i]s free of fish throughout the year, or dries up at some time during a normal rainfall year." *N.J.A.C.* 7:7A–1.4. By definition, a vernal habitat occurs in an isolated wetland. *See id.*

## II.

Before turning to Builders Association's arguments, we set forth the general principles in reviewing a challenged rule. We start with the premise that we must give great deference to an

agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible. *In re Distrib'n of Liquid Assets,* 168 *N.J.* 1, 10–11, 773 *A.2d* 6, 11–12 (2001). Such deference is appropriate because it recognizes that "agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are 'particularly well equipped to read . . . and to evaluate the factual and technical issues that . . . rulemaking would invite.' " *New Jersey State League of Muns. v. Department of Cmty. Affairs,* 158 *N.J.* 211, 222, 729 *A.2d* 21, 27 (1999) (quoting *Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs.,* 96 *N.J.* 456, 474, 476 *A.2d* 784, 794 (1984)). Consequently, agency rules are accorded a presumption of validity and reasonableness, *ibid.,* and the challenging party has the burden of proving the rule is at odds with the statute, *Bergen Pines County Hosp., supra,* 96 *N.J.* at 477, 476 *A.2d* at 794–95.

Despite that deference, a rule will be set aside if it is "inconsistent with the statute it purports to interpret." *Smith v. Director, Div. of Taxation,* 108 *N.J.* 19, 26, 527 *A.2d* 843, 846 (1987). That is, the agency " 'may not under the guise of interpretation . . . give the statute any greater effect than its language allows.' " *In re Valley Rd. Sewerage Co.,* 154 *N.J.* 224, 242, 712 *A.2d* 653, 662 (1998) (Garibaldi, J., dissenting) (quoting *Kingsley v. Hawthorne Fabrics Inc.,* 41 *N.J.* 521, 528, 197 *A.2d* 673 (1964)). Thus, if the regulation is plainly at odds with the statute, we must set it aside. *See New Jersey Tpk. Auth. v. AFSCME, Council 73,* 150 *N.J.* 331, 351–52, 696 *A.2d* 585, 595–96 (1997).

### III.

Builders Association contends that DEP exceeded its statutory authority and extended the maximum buffers allowed under the Act by (1) adding twenty feet to the statutory transition area widths for exceptional and intermediate resource value wetlands; and (2) creating a buffer for wetlands of ordinary value even though they are not required by the Act. Additionally, Builders

Association contends that the RDP Rules are not adequately supported by empirical data.

DEP counters that it adopted the RDP Rules on the basis of its experience in implementing the Act. That experience DEP argues, disclosed that both during construction and afterwards, prohibited activities were conducted in ordinary value wetlands and transition areas. DEP asserts that the twenty-foot buffer created by the RDP Rules will be more cost-effective than piecemeal enforcement actions against individual homeowners.

The legislative history of the Act demonstrates that the establishment of transition areas was the result of a "delicate compromise" between environmentalists and developers. *In re Appeal of Adoption of N.J.A.C. 7:7A–1.4,* 240 *N.J.Super.* 224, 237, 573 *A.2d* 162, 168 (App.Div.1989) (Skillman, J.A.D., dissenting), *rev'd on dissent,* 118 *N.J.* 552, 573 *A.2d* 143 (1990). Thus, transition areas appear to have been the result of the type of compromise that is part of the legislative process. *Ibid.*

The language of *N.J.S.A.* 13:9B–16a clearly directs that "[t]here shall be transition areas adjacent only to freshwater wetlands of exceptional resource value and of intermediate resource value." The width of the transition area is expressly limited to 150 feet for a freshwater wetland of exceptional resource value and 50 feet for a freshwater wetland of intermediate resource value. *N.J.S.A.* 13:9B–16b. Thus, the statute clearly sets forth the dimensions for transition areas adjacent to freshwater wetlands of exceptional and intermediate resource value. Moreover, the statute makes no reference to transition areas for wetlands of ordinary resource value.

Because the definition of residential development project includes a twenty-foot buffer, the RDP Rules not only prohibit the "[e]rection of structures" in the transition areas, *N.J.A.C.* 7:7A–2.6(a)3, but also prohibit the "construction of a new structure" anywhere within 20 feet of transition areas as well, *N.J.A.C.* 7:7A–1.4. However, if the Legislature wanted to expand the transition areas, "it would have specifically done so, [and would not have left]

such a decision to the regulator's initiative." *In re FWPA Rules, supra,* 238 *N.J.Super.* at 530, 570 *A.*2d at 443. DEP seemingly failed to account for the delicate compromise underlying the concept of transition areas when it adopted the RDP Rules.

■ Although the RDP Rules appear to serve the laudatory purpose of combating the potential spill over of regulated and/or prohibited activities into wetlands and transition areas, the decision whether to provide that additional protection resides with the Legislature. Further, even if the RDP Rules are intended to reduce DEP's burden in enforcing regulated and/or prohibited activities in wetlands and transition areas, "administrative convenience cannot support a regulation that conflicts with the governing statute." *Smith, supra,* 108 *N.J.* at 33, 527 *A.*2d at 850.

In sum, the relevant statutory provisions are clear and unambiguous. Therefore, DEP's attempt to expand the reach of the statute through the RDP Rules is *ultra vires* and cannot be sustained.

## IV.

■ Next, Builders Association contends that DEP exceeded the regulatory scope of the CWA by regulating activities in vernal habitats because the CWA does not apply to most isolated wetlands. Therefore, Builders Association asserts that DEP need not regulate such activities to comply with the CWA. In response, DEP argues that regulation of vernal habitats is necessary to ensure compliance with the CWA because the destruction of such habitats will have more than a minimal impact on the environment. Thus, our focus here is limited to GP 6 activity in vernal habitats.

■ We restate that the primary principle of statutory construction is to look at the plain language of the statute. *State v. S.R.,* 175 *N.J.* 23, 31, 811 *A.*2d 439, 444 (2002). " 'If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal

terms to divine the Legislature's intent.' " *Ibid.* (quoting *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399, 402 (1982)).

Although DEP might have a valid concern that the destruction of vernal habitats would cause adverse environmental impacts, and that such adverse environmental impacts are prohibited under the Act and the CWA, GP 6 was issued pursuant to *N.J.S.A.* 13:9B–23b, which does not mandate an adverse environmental impact analysis. Instead, the plain and unambiguous language of *N.J.S.A.* 13:9B–23b requires that activities in isolated wetlands neither (i) disturb or destroy more than one acre of freshwater wetland, nor (ii) take place in wetlands of exceptional resource value. Those requirements are, in effect, a substitute for the adverse environmental impact requirement of *N.J.S.A.* 13:9B–23c.

We find no justification to read into *N.J.S.A.* 13:9B–23b the adverse environmental impact requirement of *N.J.S.A.* 13:9B–23c. When the Legislature expressly includes a requirement in one subsection and excludes that same requirement in other subsections of the same general statute, we need not strain to import that requirement where it is not. *See Higgins v. Pascack Valley Hosp.,* 158 *N.J.* 404, 419, 730 *A.*2d 327, 335 (1999) (noting that a term used by Legislature in one place should not be implied in another if excluded). We are convinced that if the Legislature intended to make general permits under both *N.J.S.A.* 13:9B–23b and *N.J.S.A.* 13:9B–23c subject to an adverse environmental impact analysis, it would have done so explicitly.

In further support of its argument that *N.J.S.A.* 13:9B–23b requires an adverse environmental impact analysis, DEP refers to a Senate Committee Statement containing the following description of general permits:

> This bill authorizes [DEP] to issue general permits for certain categories of activities that would have minimal adverse environmental impacts on freshwater wetlands. A person proposing to conduct an activity covered under a general permit would normally be required only to give [DEP] 30 days notice of intent to conduct the activity. [DEP] is authorized to issue general permits for: activities that involve one acre or less of an isolated wetland, or one acre or less of a man-made drainage ditch or swale; maintenance of roads, public utilities, and stormwa-

ter management facilities; maintenance, reconstruction and moderate size improvements to existing dwellings; mosquito management activities; and State or federally funded roads permitted by the [Corps]. [DEP] would retain authority to review any activity conducted under a general permit, and require an application for an individual permit if warranted by the specific nature of the activity.

[Senate Energy and Environmental Subcommittee, *Statement to Assembly Bills Nos. 2342 and 2499*, at 5 (June 25, 1987).]

 Because the terms of the Act are clear and unambiguous, we need not resort to such extrinsic evidence to aid our interpretation. *S.R., supra*, 175 *N.J.* at 31, 811 *A.*2d at 444. Moreover, even if the language is interpreted as ambiguous, "considered judgment as to the weight to be accorded [such statements] must be exercised." *Howard Savs. Inst. v. Kielb*, 38 *N.J.* 186, 195, 183 *A.*2d 401, 406 (1962). While the statement provides that the Act authorizes certain general permits that require an adverse environmental impact analysis, it does not state that all general permits require such analysis. Hence, even if we were to consider the statement, it does not contradict our conclusion that the Act does not require an adverse environmental impact analysis for general permits issued pursuant to *N.J.S.A.* 13:9B–23b.

 We do not question that DEP has the authority to modify or rescind a general permit pursuant to *N.J.S.A.* 13:9B–23d. However, the Appellate Division concluded that subsection d. authorized DEP to accomplish by way of a rule of general applicability what it could accomplish on an individual basis. We do not agree with that broad proposition. Instead, we are persuaded that the authority given to DEP pursuant subsection d. does not permit DEP to issue a general rule in contravention of the express provision for the issuance of a general permit under *N.J.S.A.* 13:9B–23b. Pursuant to *N.J.S.A.* 13:9B–23d, DEP may modify or rescind a general permit only upon proper findings on a case-by-case basis.

In summary, the Legislature intended a general permit to be issued if activities in isolated freshwater wetlands neither (i) disturb or destroy more than one acre, nor (ii) take place in

wetlands of exceptional resource value. *N.J.S.A.* 9:13B–23b. The Legislature could have made general permits for activities in such wetlands subject to an adverse environmental impact analysis, and could have included vernal habitats in the definition of wetlands of exceptional resource value, but it did not. Further, any attempt by DEP to modify or rescind a general permit pursuant to *N.J.S.A.* 13:9B–23d, must be done on an individual basis. DEP's well-intended efforts to expand the reach of the Act should be addressed to the Legislature. Therefore, we hold that DEP's attempt to incorporate a vernal habitat ban on GP 6 activities exceeded its statutory authority under the Act.

V.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.