# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1001-17T3

DEPARTMENT OF CHILDREN
AND FAMILIES,

      Petitioner-Respondent,

v.

J.S.,

      Respondent-Appellant.

_____

Argued telephonically February 7, 2019 –
Decided May 30, 2019

Before Judges Fasciale and Gooden Brown.

On appeal from the New Jersey Department of Children and Families, Division of Child Protection and Permanency, Case Id No. 17126447.

Michael R. Ascher argued the cause for appellant (Einhorn Harris Ascher Barbarito & Frost PC, attorneys; Michael R. Ascher, on the briefs).

Peter Damian Alvino, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason Wade Rockwell,

Assistant Attorney General, of counsel; Peter Damian Alvino, on the brief).

PER CURIAM

Defendant J.S.[1] appeals from the October 6, 2017 final agency decision of the Department of Children and Families (DCF), Division of Child Protection and Permanency (DCPP), finding that allegations he abused his then seven-year-old daughter S.S. were "not established."[2] The finding stemmed from an allegation that defendant sexually abused S.S. by touching her vagina in an inappropriate manner.

On appeal, defendant raises the following arguments for our consideration:

POINT I

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

[2] The agency's letter referred to N.J.A.C. 10:129-7.3(c)(3), which was later recodified to Title 3A of the New Jersey Administrative Code. See 49 N.J.R. 98(a) (Jan. 3, 2017). In this opinion, we will refer to the current citation of the rule at N.J.A.C. 3A:10-7.3(c)(3). Because a "not established" finding is considered purely investigatory, rather than adjudicatory in nature, and the regulations do not permit an administrative hearing for a "not established" finding, we "deem it a final decision subject to appellate review under Rule 2:2-3(a)(2)." N.J. Dep't of Children & Families v. R.R., 454 N.J. Super. 37, 40 n.3 (App. Div. 2018).

THE "NOT ESTABLISHED["] FINDING WAS THE RESULT OF [DCPP'S] ARBITRARY, CAPRICIOUS[,] AND UNREASONABLE ACTION LACKING FAIR SUPPORT IN THE ADMINISTRATIVE RECORD AND REQUIRING ITS REVERSAL AND THE ENTRY OF [AN] "UNFOUNDED" FINDING[.]

POINT II

[DCPP'S] OWN POLICIES AND MANUAL REGARDING ABUSE AND NEGLECT INVESTIGATIONS DO NOT SUPPORT A FINDING OF "NOT ESTABLISHED[.]"

POINT III

THE "NOT ESTABLISHED" FINDING INURES TO THE DETRIMENT OF [DEFENDANT] IN FUTURE CUSTODY MATTERS[.]

Having considered defendant's arguments in light of the administrative record and the governing legal standards, we reverse.

DCPP's investigation began when it received a referral from Dr. Shannon Albarelli, S.S.'s psychologist. After her parents divorced, S.S. began treatment with Albarelli in November 2016 due to difficulty adjusting to the transition and "feelings of sadness surrounding spending time at [defendant's] house." On July 7, 2017, Albarelli reported to DCPP that S.S. had disclosed to her during therapy that on the morning of July 6, 2017, during an overnight visit with defendant,

3

defendant "woke [S.S.] up[,] . . . put her in the shower[,]" and then "proceeded to rub her private parts, (vagina)." Albarelli also stated that defendant reportedly "looks at [S.S.'s] vagina [everyday] that she . . . visits," and "wakes [S.S.] up before her [two brothers] and takes her to the shower." S.S.'s brothers, A.S., S.S.'s twin, and Ar.S., then three years old, accompanied S.S. during her visits to defendant's home.

Based on Albarelli's referral, on July 7, 2017, DCPP workers interviewed L.M., S.S.'s mother, who stated that S.S. had never disclosed any sexual abuse to her. According to L.M., although they had joint custody and a court ordered shared parenting plan, S.S. did not like to visit with defendant because he was easily angered and difficult to talk to, which made S.S. feel "pushed around." L.M. described defendant as a very intense individual who had problems respecting the boundaries of others, a trait S.S. did not like. According to L.M., defendant also had anxiety issues and difficulty managing the children.[3] When asked if S.S. had ever disclosed any inappropriate behavior by defendant, L.M.

---

[3] In January 2017, a prior allegation of child abuse involving the family was deemed "unfounded." There, defendant had allegedly pulled A.S.'s wrist in anger and the treating doctor reported the allegation to DCPP. According to L.M., the incident demonstrated defendant's difficulty managing the children.

responded that he gave S.S. "raspberries" on her chest under her clothing.[4] In a later interview, L.M. explained that S.S. does not like to be touched, but defendant was always hugging and giving her kisses.

DCPP workers also interviewed A.S., who "denied that [defendant] wakes [S.S.] . . . up first or . . . takes her from [her bedroom]." According to A.S., "he is the first to wake up at both of his homes." A.S. also denied that his siblings spent any "alone time with [defendant,]" and "denied being afraid of anyone in each of his homes" or feeling unsafe. Attempts to interview Ar.S. were unsuccessful, given his age. DCPP promptly implemented a safety protection plan, discontinuing S.S.'s visits with defendant pending completion of the investigation, and requiring visits between defendant and his sons to be supervised by defendant's current wife, P.S. Additionally, DCPP reported the allegation to the Morris County Prosecutor's Office (MCPO), and was advised not to interview S.S. or defendant while the criminal investigation was ongoing. DCPP also referred S.S. for medical and psychological evaluations.

On July 7, 2017, MCPO Detective Hill interviewed S.S. about the allegations. During the interview, S.S. informed Hill that despite having her

---

[4] L.M. described "raspberries" as "blow[ing] in the children['s] stomach" and "mak[ing] like a spit[t]ing/farting sound."

own bathroom at defendant's house, sometimes, "[defendant] sees her 'naked in the morning'" "while she is in the shower." S.S. explained that although "she showers alone," defendant "turn[s] the water on to make sure it is not hot[,]" checks on her while she showers to make sure "she is okay[,] and tells her to hurry up." When Hill asked whether "[defendant] touches her while she is in the shower," S.S. replied "[defendant] touches her on her 'toto' [(vagina in Catalan language)]" and, after her shower, "puts cream on it when it is red."

When Hill "asked [S.S.] to describe how [defendant] applie[d] the cream[,]" S.S. explained that "[defendant] makes his fingers go in circles" for "about [one] minute[,]" and stated "[defendant] only touches the top of [the] [t]oto and not inside." Using anatomical dolls, S.S. demonstrated for Hill "how [defendant] rubbed her 'toto'" by "pull[ing] the underwear off the girl doll and rub[bing] the top of [the] toto." However, contrary to her earlier statement, S.S. said "sometimes [defendant] goes inside [the] toto." Additionally, while S.S. denied "knowing how often this has occurred," she "also said that [defendant] has not touched her toto more than once."

When asked whether defendant touched her elsewhere, S.S. "informed [Hill] that [defendant] touched her boob five months ago, but then said it occurred when she was a baby." Further, S.S. denied seeing "[defendant]

touching himself" but disclosed that "she sometimes sees [defendant] pee and it takes a really long time, but noted that this [was] not usual." She elaborated that "she will be in the bathroom and [defendant] will come into the bathroom and pee." After the interview, Hill conferred with L.M., who felt that S.S.'s disclosure was "a little different than what she said earlier" to Albarelli.[5]

On July 25, 2017, child abuse pediatrician Julia DeBellis, M.D., conducted a medical evaluation of S.S. During the evaluation, S.S. disclosed that "[defendant] touches [her] toto." When asked to elaborate, S.S. explained that "almost each time she takes a shower[,]" defendant "come[s] into the bathroom . . . , touches and pats her 'toto' and then leaves the bathroom." S.S. reported that defendant "touches [her] toto" and tells her "to wash [it]" when "[she] already did." Notably, S.S. made no mention of defendant applying cream to her vagina, and, although S.S. denied any penile contact with defendant, she "stated that she has seen [defendant's] 'private part'" because "he goes to the bathroom and does [not] lock the door."

Based on her evaluation of S.S., DeBellis concluded that "[t]he general physical and the anogenital examinations revealed no abnormalities." She found

---

[5] According to Albarelli, L.M. was present when S.S. made the disclosure at the end of their therapy session.

A-1001-17T3

that the examination "neither confirm[ed] nor denie[d] the possibility of sexual abuse and should in no way discredit [S.S.'s] disclosure." She also noted that "[a]t this point in time, it [was] unclear if the genital touching described was in a caretaking manner or one that [was] abusive." Thus, "[t]here should be further investigation into [S.S.'s] feeling about this activity and the need for this level of child care." DeBellis recommended "on-going therapy to assess the possibility of any emotional trauma that [S.S.] may have suffered from this event and to better understand the nature of the genital touching that she described."

On the same date, psychologist Sarah Seung-McFarland, Ph.D., conducted a psychosocial mental health evaluation of S.S. Initially, S.S. refused to discuss defendant "touch[ing] her privates" when it "[was] red" and informed Seung-McFarland that she had already told "1000 people!" S.S. only reported that defendant never allowed her privacy, was "bothering [her,]" was "mean to [her,]" and paid more attention to her brothers than to her.

However, after being prodded by L.M., S.S. reported the following to Seung-McFarland:

> [S.S.] informed that her father touches her in the shower every visit since January. She stated it only occurs in the shower. She noted her father comes in when the shower is running and opens the shower door. She further stated he says, "[S.S.], you[r] toto [is] red . . . and says different things every time." She also stated

he will tell her she needs to wash it after she already washed it. When asked if she uses a sponge, she stated she does[,] but her father does not. When asked what she thinks about him doing it, [S.S.] stated it is "unpolite" and she feels "bad" about it. Asked what makes him stop, [S.S.] stated, "I have to wait until he [is] done." [S.S.] denied that she needs help in the shower.

S.S. stated further that defendant touched her on her "boob" "more than once when she turned seven[,]" but "she forgot what [defendant] said when [he] touched her there." She also said that her father and mother both put cream on her privates, but she had no idea why. However, when questioned by Seung-McFarland about the latter disclosure, L.M. denied putting cream on S.S.'s privates, explaining that at her home, S.S. applies cream by herself if needed.

Based upon her evaluation, Seung-McFarland diagnosed S.S. with "Adjustment Disorder with [A]nxiety[,]" "Parent-Child Relational Problem[s,]" and "Disruption of Family by Separation or Divorce." She concluded:

> With regard to the allegations, this evaluation cannot determine with any degree of psychological certainty whether or not [S.S.] was sexually abused by her father as suggested. Nevertheless, [S.S.] reported that her father touched her on her private area (e.g., toto) while showering, made comments that it is red, and put cream on it more than once. There are also reports that he sees her naked, comes into the bathroom to pee when she is there, and does "raspberries." At the very least, these behaviors suggest inappropriate boundaries, and are consistent with reports that [defendant] does not respect

9

the children, is dismissive of them, and treats the twins like babies.

Seung-McFarland noted that S.S.'s "poor mood regarding her father suggests her problematic relationship with him is significant for her" and "[h]er reported desire for her father's attention . . . along with her perception that he is mean, yells, and lies suggests that [S.S.] has not been able to establish a supportive and nurturing relationship with her father." Further, according to Seung-McFarland, "[S.S.'s] reported irritability after visits with her father further reflects her problematic adjustment to the family structure/dynamics." Seung-McFarland recommended that S.S. should "continue to participate in therapy to address her problematic relationship with her father, her recent disclosure of inappropriate touching, her parent's divorce, and family dynamics."

On August 29, 2017, Hill interviewed defendant about the allegations. Defendant stated that on the morning of the alleged incident, July 6, 2017, he was on a 6:00 a.m. flight to San Francisco for work and S.S. was still sleeping when he left. Defendant admitted that "on one occasion [S.S.] told him that her vagina area was itching." After "[h]e had [S.S.] point to where she was itching[,] . . . he put [Desitin] cream on her vagina." According to defendant, "the second time [S.S.] complained" of vaginal itching, "he gave her cream" and had her put

10

the cream on herself. He denied ever "put[ting] his hand inside [S.S.'s] vagina" and acknowledged that S.S. "is not a person who likes to be touched[,] . . . hugged[,] [or] kiss[ed]."

Defendant explained further that A.S. and S.S. have been bathing by themselves for about a year, but that he or his nanny would bathe Ar.S. Defendant stated that "in the morning[,] he goes into [the bathroom] to set the bath or shower temperature, while [S.S.] is taking off her pajamas preparing to get in the bathroom." "[A]fterwards he goes [downstairs]." According to defendant, when "[S.S.] is taking a shower[,] he will knock on the door to see [i]f she is okay" as "knocking is a rule in his home." He also stated that he may "yell" for her "to hurry up" if she is taking too long, and will enter the bathroom "if she does [not] answer."

Defendant informed Hill that prior to the divorce, "his relationship with [S.S.] was okay," but that "she is closer to her mother." He indicated that "[S.S.] feels . . . he shows favoritism to [Ar.S.]" and "sometimes[,] when he goes to pick up the children[,] [S.S.] wants to stay with her mother." However, once "she gets to his home[,] she is fine." While "[h]e described his relationship with his children as wonderful[,]" defendant acknowledged that his current wife was not always "excited about being with the children." He stated that S.S. had

11

"complained to her mother that his wife treats them different[ly] when he is not there." He also reported that "[S.S.] sometimes likes to tell stories" and "push[es] her limits with him."

Defendant was administered a polygraph exam, which he passed to Hill's satisfaction. Thereafter, Hill informed DCPP that his office would not pursue the matter further because, in his opinion, while "the incident happened," it was not "sexual[] [in] nature." Following DCPP's investigation, which was detailed in an investigation summary, DCPP also determined that while "the incident did happen[], . . . there [was] insufficient documentation to support that it was in a sexual manner." Based on this finding, DCPP determined that "[t]he allegation of [s]exual [a]buse-[s]exual [m]olestation of [S.S.] . . . by [defendant] is [not] [e]stablished. There is not a preponderance of evidence that [S.S.] is . . . abused or neglected by definition, but evidence indicates that [S.S.] was harmed or placed at risk of harm."

On October 6, 2017, DCPP mailed defendant its determination letter, which was signed by the DCPP worker who conducted the field investigation and the worker's supervisor. In addition to notifying defendant of the "[n]ot [e]stablished" finding, the letter informed defendant that "[a] record of the

12

incident [would] be maintained in [DCPP's] files" but would "not be disclosed by [DCPP] except as permitted by N.J.S.A. 9:6-8.10a." This appeal followed.

The scope of our review is limited. In re Stallworth, 208 N.J. 182, 194 (2011). In reviewing a final agency decision, we "must defer to an agency's expertise and superior knowledge of a particular field[,]" Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992), and "extend substantial deference to an 'agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible' based on the agency's expertise." R.R., 454 N.J. Super. at 43 (quoting In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489 (2004)).

"Thus, we are bound to uphold an agency's decision 'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 301-02 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). In applying that standard of review, our function is not to substitute our judgment for that of the administrative agency. Barrick v. State, 218 N.J. 247, 260 (2014). "However, we are 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue[,]'" T.B., 207 N.J. at 302 (first alteration in original) (quoting Mayflower Sec. Co. v.

Bureau of Sec. in Div. of Consumer Affairs of Dep't of Law & Public Safety, 64 N.J. 85, 93 (1973)), and "if an agency's statutory interpretation is contrary to the statutory language, or if the agency's interpretation undermines the Legislature's intent, no deference is required." Reilly v. AAA Mid-Atl. Ins. Co. of N.J., 194 N.J. 474, 485 (2008) (quoting In re N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 351 (1997)).

Defendant argues "the 'not established' finding was clearly arbitrary, capricious[,] and unreasonable or lack[ed] fair support in the . . . record" because the "investigation did not produce evidence indicating that S.S. was either actually harmed or placed at risk of harm by [defendant's] conduct, which was specifically alleged to be sexual in nature." According to defendant, instead, through its experts, DCPP "was only able to conclude that there existed a problematic relationship between S.S. and her father, arising from her parents' divorce and the family dynamics." Thus, defendant continues, "[u]nder the circumstances, the determination . . . should have been designated 'unfounded.'" We agree.

A "not established" finding "is one of four outcomes [DCPP] may reach after investigating an abuse or neglect allegation." R.R., 454 N.J. Super. at 40. See N.J.A.C. 3A:10-7.3(c)(1) to (4); Dep't of Children & Families v. D.B., 443

N.J. Super. 431, 441-42 (App. Div. 2015) (discussing four-tier framework of "substantiated," "established," "not established," and "unfounded" allegations).

> "An allegation shall be 'not established' if there is not a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21,[6] but evidence indicates that the child was harmed or was placed at risk of harm." N.J.A.C. 3A:10-7.3(c)(3) . . . . A parent is completely cleared of wrongdoing only if the allegation is "unfounded," that is, "if there is not a preponderance of the evidence indicating that a child is an 'abused or neglected child' . . . and the evidence indicates that a child was not harmed or placed at risk of harm." N.J.A.C. 3A:10-7.3(c)(4). The Division must indefinitely retain on file the record of "not established" findings. N.J.A.C. 3A:10-8.1(b). But, records related to "unfounded" findings are generally expunged. See N.J.A.C. 3A:10-8.1(a), -8.3.
>
> [R.R., 454 N.J. Super. at 40-41 (footnote omitted).]

"As [DCF] explained in adopting the regulation, 'not established findings are based on some evidence, though not necessarily a preponderance of evidence, that a child was harmed or placed at risk of harm.'" Id. at 41 (quoting 45 N.J.R. 738(a) (Apr. 1, 2013) (response to Comment 86)). In this context, evidence of "a child having been harmed or placed at risk of harm" is "a lesser standard" than "the 'substantial risk of harm' or 'imminent danger' required to

---

[6] Pertinent here, "'[a]bused or neglected child' means a child less than [eighteen] years of age whose parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child[.]" N.J.S.A. 9:6-8.21(c)(3).

15

establish abuse or neglect under [N.J.S.A. 9:6-8.21]." Id. at 42. "Notably, although the regulation utilizes a passive construction—'was harmed or was placed at risk of harm'—the apparent intent is to attribute the harm or the placement at risk of harm to a particular perpetrator." Id. at 43.

Notwithstanding our deferential standard of review, we are constrained to reverse because the finding that S.S. was harmed or placed at risk of harm by defendant lacked fair support in the investigatory record compiled by DCPP. The crucial question is whether there was any evidence that defendant harmed or placed S.S. at risk of harm in relation to "[t]he allegation of [s]exual [a]buse-[s]exual [m]olestation." While DCPP concluded that "the incident did happen[,]" which we presume refers to the incident in which defendant admitted putting cream on S.S.'s vagina when she complained of vaginal itching,[7] DCPP also concluded that defendant's affirmative act was not sexual in nature. Nonetheless, DCPP concluded that defendant harmed or placed S.S. at risk of harm without articulating the basis for that conclusion. In fact, the investigatory record supports a contrary conclusion because after finding the evidence of

---

[7] Our presumption is based on the language in the investigation summary under the section entitled "[f]indings." The perfunctory letter served on defendant advising him of the outcome of DCPP's investigation provided no information about the evidence relied upon to support the finding.

sexual abuse inconclusive, neither expert determined that S.S. was harmed or placed at risk of harm as a result of "the incident." Instead, DeBellis recommended "on-going therapy to assess the possibility of any emotional trauma that [S.S.] may have suffered from this event" and Seung-McFarland's diagnosis of S.S. related to S.S.'s "problematic relationship with her father," her "parent's divorce," and her "family dynamics." Conspicuously absent from Seung-McFarland's diagnosis was any condition related to sexual abuse.

Because we conclude DCPP "erred in finding the allegation was 'not established,' [DCPP] shall deem the allegation to be 'unfounded' and treat the records accordingly." Id. at 48. Based on our decision, we need not address defendant's remaining arguments, other than to point out that we reach this result mindful that a "not established" finding "still permanently tars a parent with a finding that there was something to the allegation." Id. at 39. While a "not established" finding is purely investigative in nature and is not made public through inclusion of the perpetrator's name on the Central Registry or during a Child Abuse Record Information (CARI) check, the permanent retention of "not established" findings means that records continue to be subject to disclosure in

A-1001-17T3

a host of situations.  See N.J.S.A. 9:6-8.10a(b).[8]  Given the nature of the allegation in this case, we agree with defendant that such disclosure "inures to [his] detriment."

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8]  For example, since they are not subject to expungement, the Division's "records," "information," and "reports of findings" of a "not established" determination would be accessible upon written request to "[a]ny person or entity mandated by statute to consider child abuse or neglect information when conducting a background check or employment-related screening of an individual employed by or seeking employment with an agency or organization providing services to children[.]"  N.J.S.A. 9:6-8.10a(b)(13).

A-1001-17T3