# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2003-17T2

DEPARTMENT OF CHILDREN
AND FAMILIES,

     Petitioner-Respondent,

v.

I.S.,

     Respondent-Appellant.

_____

     Submitted July 16, 2019 – Decided July 30, 2019

     Before Judges Vernoia and Mayer.

     On appeal from the New Jersey Department of Children and Families, Division of Child Protection and Permanency, Case Id No. 10583930.

     Rosemarie A. Anderson, attorney for appellant.

     Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; Joann Marie Corsetto, Deputy Attorney General, on the brief).

PER CURIAM

Defendant I.S. appeals from the final agency decision of the Department of Children and Families (DCF), Division of Child Protection and Permanency (Division), finding an allegation she abused her three-year-old son, R.S., was "not established." N.J.A.C. 3A:10-7.3(c)(3). Based on our review of the record in light of the applicable law, we are convinced the not established finding is supported by substantial credible evidence and is not otherwise arbitrary, capricious or unreasonable, and affirm.

I.

On July 24, 2013, the Division received a referral of possible child abuse or neglect in connection with the drowning death of I.S.'s three-year-old son, R.S. in a pool in his grandmother M.B.'s backyard. The Division investigated and, in a January 10, 2014 letter, notified I.S. that child neglect was "substantiated" for "[i]nadequate [s]upervision with regard to" R.S. I.S. appealed the Division's finding and a hearing was held before an administrative law judge (ALJ).

Following the hearing, the ALJ issued an initial decision finding that on July 24, 2013, I.S. took R.S. to her mother's, M.B.'s, home to visit and have dinner. Upon arriving at M.B.'s home, I.S. went into the kitchen to prepare dinner and R.S. "was in and out of the front of the house playing with" children

A-2003-17T2

from the neighborhood. The front of the house included a porch and the backyard included "an above-ground pool, the entrance of which is decked and gated."

The ALJ summarized the witnesses' testimony. On July 24, 2013, police Sergeant Ronald Fusco investigated the incident. He described the above-ground pool and explained it "had four wooden deck-type steps . . . lead[ing] up from the ground to the decked platform" with a "small gate at the top of the steps that is secured by a latch and bar." Sergeant Fusco could not "determine if the gate to the pool was secured or not at the time of the incident." He concluded R.S.'s death was accidental.

The ALJ detailed the testimony of Division Investigator James Williams, who described his interview with M.B. on the day following the incident. Williams testified M.B. said R.S. and the "other children from the neighborhood" were playing on the porch and "making a lot of noise." At one point, R.S. entered the house and asked M.B. if he could go to the park to play with the other children. M.B. referred R.S. to I.S., who told R.S. he could not go to the park. R.S. then returned to the porch and continued playing with the other children.

A-2003-17T2

According to Williams, M.B. also reported it was common for the children to play by themselves outside of her home without "an adult actually being outside with them," but on July 24, 2013, "the children were all within [sight] because the front of the house is surrounded by windows and the children could all be heard playing." M.B. reported she could see the porch and front yard from the living room where she was located while the children played. She also reported the backyard was visible from the kitchen. M.B. told Williams that "when it suddenly became quiet because the children were not making noise she immediately asked about R.S. and [she and the other adults present] began asking and looking for him."

The ALJ further noted that Williams interviewed the doctor who performed R.S.'s autopsy. The doctor reported that R.S.'s "organs were filled with fluid but that it only takes a few minutes for that to happen." Williams concluded R.S. was inadequately supervised because the three-year-old child was left unattended and none of the witnesses he interviewed "could say what period of time R.S. was missing," "[t]he statements of the adults varied as to how long R.S. was unaccounted for" and, based on the statements he obtained, "R.S. was unaccounted for anywhere from twenty to sixty . . . minutes." In

arriving at his determination, Williams considered that "all of the adults said that it was common for R.S. to play outside without adult supervision."

The ALJ also summarized M.B.'s testimony that she was in her living room talking to a friend while R.S. played on the front porch and in the front yard with "other kids from next door and [the] neighborhood." M.B. said she was "going back and forth from her living room to the front porch," and R.S. entered the house on two occasions asking if he could go to the playground but was told "no." She explained that R.S. was then playing outside but "[s]uddenly the noises stopped" and within "two minutes" she "ask[ed] about the whereabouts of R.S. because his dinner was ready." M.B. denied that R.S. had ever gone to the park or played in the backyard without adult supervision, and she "never heard the children in the backyard" on July 24, 2013.

The ALJ also detailed the recorded interviews of Blair and Ida,[1] the two eleven-year-old children who played with R.S. on the day of the incident. In her first statement, Blair said she and Ida played with R.S., but they left him at his grandmother's home when he said he could not go to the park. In her second statement, Blair said the three children were in the backyard, and R.S. stood "on

_____

[1] We use pseudonyms for these children to protect their privacy.

A-2003-17T2

the things that hold up the pool" and touched the water. Blair said she took R.S. off of the "things," brought him to the house and then went to the park with Ida.

The ALJ explained that Ida reported that she and Blair were touching the water in the pool, and R.S. climbed onto a bin "so he could touch the water too." Ida said she took R.S. off of the bin, and she went to the park, leaving Blair and R.S. in the front yard. Blair later joined Ida at the park, where Blair said she had taken R.S. into the house before she left for the park.

The ALJ summarized I.S.'s testimony. I.S. testified that after arriving at M.B.'s house, she went into the kitchen to prepare dinner and "could see the back yard through the back door." She said R.S. played outside on the front porch with other children and entered the house twice asking if he could go to the park. On both occasions, she told him he could not go to the park. She explained that "she could tell where R.S. was at all times because she could hear him," but that "suddenly everything was quiet." She heard M.B. say, "where's R.S.," and she and a friend looked for R.S. I.S. found R.S. in the backyard pool. The ALJ noted I.S. said she had been at M.B.'s house "at most a little less than one hour" and "R.S. was not missing more than five to ten minutes."

The ALJ rejected the Division's conclusion that I.S. allowed R.S. to play outside unsupervised. The ALJ noted that R.S. was playing on the porch and

was continuously running in and out of the house and that there were at least four adults in the home. The ALJ found the adults reacted immediately "when it suddenly got quiet" and that a very short time elapsed from when R.S. was last on the porch to when he went missing. The ALJ rejected Williams' conclusion that R.S. was unsupervised for twenty to sixty minutes and concluded the evidence was insufficient to substantiate neglect. The ALJ recommended reversal of the DCF's substantiation finding.

The Division filed exceptions to the ALJ's determination, but limited its argument to the assertion that the ALJ erred by failing to consider whether the substantiation finding should be changed to "unfounded" or "not established." N.J.A.C. 3A:10-7.3(c)(3), (4). In its final agency decision, the DCF modified the ALJ's order, finding that although the evidence supported the ALJ's finding that I.S. did not neglect R.S., N.J.S.A. 9:6-8.21(c)(4), "the finding should be 'not established' as the record supports that R.S. was harmed and accordingly, the appropriate finding is 'not established' pursuant to N.J.A.C. 3A:10-7.3(c)[(3)]."[2] This appeal followed.

---

[2] The DCF subsequently issued a Notice of Change of Child Abuse or Neglect Finding stating that the "substantiated child abuse or neglect" finding was changed "on appeal" to a "not established" finding, and erroneously advising that the "records associated with this investigation shall be expunged from DCF

I.S. presents the following arguments for our consideration:

POINT I

[THE DIVISION'S] FINDING IS ARBITRARY, CAPRICIOUS, UNREASONABLE AND UNSUSTAINABLE IN LAW AND FACT AND A FINDING OF "UNFOUNDED" WOULD BE CONSISTENT WITH [THE] ALJ['S] . . . INITIAL DECISION.

POINT II

[THE DIVISION'S] EXCEPTIONS TO [THE] ALJ['S] . . . INITIAL DECISION FAIL TO MEET THE REQUIREMENTS UNDER [N.J.A.C.] 1:1-18.4 AND MUST NOT BE PERMITTED TO STAND.

POINT III

[THE DIVISION] HAD MANY OPPORTUNITIES TO CHANGE ITS FINDING BUT DID NOT AND SHOULD NOT NOW BE PERMITTED TO DO SO WHEN THEY HAVE A FINDING THAT IS ADVERSE TO THEM, THIS IS GIVING THEM A SECOND BITE AT THE APPLE.

POINT IV

THE FINDING OF "NOT ESTABLISHED" PREJUDICES [I.S.] IN HER FUTURE ASPIRATIONS TO WORK WITH CHILDREN AND

---

files pursuant to N.J.S.A. 9:6-8.40a" unless certain specified events occurred. The DCF subsequently issued an Amended Notice of Change of Child Abuse or Neglect Finding, again stating that the "substantiation of a child abuse or neglect" finding was changed to "[n]ot [e]stablished," but noting that "[a] record of the investigation will be retained in DCF files."

THE ELDERLY AND AT [TWENTY-FIVE] YEARS OLD THIS STANDS TO IMPACT NEGATIVELY ON THE REST OF HER LIFE.

## II.

The scope of our review of a final agency decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011). We "must defer to an agency's expertise and superior knowledge of a particular field," Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992), and "extend substantial deference to an 'agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible' based on the agency's expertise." N.J. Dep't of Children & Families v. R.R., 454 N.J. Super. 37, 43 (App. Div. 2018) (quoting In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489 (2004)).

Here, we consider whether the DCF's "not established" finding is clearly "arbitrary, capricious, or unreasonable" or lacked "fair support in the record." Dep't of Children & Families v. T.B., 207 N.J. 294, 301 (2011) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)); see also Dep't of Children & Families v. D.B., 443 N.J. Super. 431, 440 (App. Div. 2015). "However, we are 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue,'" T.B., 207 N.J. at 302 (first alteration in original) (quoting Mayflower Sec. Co. v. Bureau of Sec. in Div. of Consumer Affairs of Dep't of

<u>Law & Pub. Safety</u>, 64 N.J. 85, 93 (1973)), and "if an agency's statutory interpretation is contrary to the statutory language, or if the agency's interpretation undermines the Legislature's intent, no deference is required," <u>Reilly v. AAA Mid-Atl. Ins. Co. of N.J.</u>, 194 N.J. 474, 485 (2008) (quoting <u>In re N.J. Tpk. Auth. v. AFSCME, Council 73</u>, 150 N.J. 331, 351 (1997)).

I.S. argues the evidence establishes only that R.S.'s death was accidental and therefore supports the ALJ's finding, which the DCF does not challenge, that she did not abuse or neglect R.S. I.S. contends "[t]he only logical and legal conclusion . . . is an 'unfounded' finding" and that, as a result, the DCF's "not established" finding is not supported by the evidence and is arbitrary, capricious and unreasonable.

A "not established" finding "is one of four outcomes the Division may reach after investigating an abuse or neglect allegation." <u>R.R.</u>, 454 N.J. Super. at 40. The DCF "shall make a finding that an [abuse or neglect] allegation is 'substantiated,' 'established,' 'not established,' or 'unfounded.'" N.J.A.C. 3A:10-7.3(c). "An allegation shall be 'not established' if there is not a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21, but evidence indicates that the child was harmed or was placed at risk of harm." <u>R.R.</u>, 454 N.J. Super. at 40 (emphasis removed) (quoting N.J.A.C.

3A:10-7.3(c)(3)). Only if "the evidence indicates that a child was not harmed or placed at risk of harm," is the allegation deemed "unfounded." N.J.A.C. 3A:10-7.3(c)(4). As the Division has explained, "[t]he critical distinction between findings of not established and unfounded is that not established findings are based on some evidence, though not necessarily a preponderance of evidence, that a child was harmed or placed at risk of harm." 45 N.J.R. 738(a) (April 1, 2013) (response to Comment 86). "[P]lacing a child 'at risk of harm' may involve a lesser risk than the 'substantial risk of harm' or 'imminent danger' required to establish abuse or neglect under the statute." R.R., 454 N.J. Super. at 42.

Sadly, but indisputably, the DCF's finding that R.S. was "harmed or placed at risk of harm" is supported by "some evidence": three-year-old R.S. was left to play without direct adult supervision, wandered from the front porch to the backyard, entered an above-ground pool and drowned. That evidence precluded the unfounded finding that I.S. urges; an unfounded finding may be made only where the child is neither harmed nor placed at risk of harm. N.J.A.C. 3A:10-7.3(c)(4).

Moreover, we reject I.S.'s contention that the DCF's failure to establish by a preponderance of the evidence that I.S. neglected R.S. under N.J.S.A. 9:6-

11

8.21(c) requires an unfounded finding. The argument ignores that a finding of no abuse or neglect is measured against a different legal standard and quantum of proof and is not determinative of a not established finding under N.J.A.C. 3A:10-7.3(c)(3), and that a not established finding, by definition, is made where the evidence does not establish the child was abused or neglected. See R.R., 454 N.J. Super. at 41-42 (explaining the different standards for establishing abuse or neglect under N.J.S.A. 9:6-8.21(c) and sustaining a not established finding under N.J.A.C. 3A:10-7.3(c)(3)). In sum, the DCF's not established finding is supported by some evidence and I.S. fails to demonstrate the finding is otherwise arbitrary, capricious or unreasonable.

I.S. further argues that the DCF was barred from changing its finding following the ALJ's decision and that the finding should be reversed because it will negatively impact I.S.'s plans to work with children and the elderly in the future. The arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2003-17T2